UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE UNITED STATES OF AMERICA,

-against-

KEONNE RODRIGUEZ and WILLIAM
LONERGAN HILL,

Defendants.

---

Case No.: 24 CR. 82 (RMB)

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS INDICTMENT

Roger A. Burlingame
Matthew L. Mazur
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500
roger.burlingame@dechert.com
matthew.mazur@dechert.com

*Counsel for Defendant William
   Lonergan Hill*

Michael Kim Krouse
William T. Sharon
Maya Kouassi
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
michael.krouse@arnoldporter.com

Anthony J. Franze (*pro hac vice* pending)
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20004
(202) 943-6479
anthony.franze@arnoldporter.com

*Counsel for Defendant Keonne Rodriguez*

## TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................... 1

LEGAL STANDARD............................................................................................... 5

BACKGROUND....................................................................................................... 6

    A.    Cryptocurrency, Privacy, and CoinJoin Apps......................................... 6

    B.    The Samourai Wallet CoinJoin App ....................................................... 8

    C.    Statutory and Regulatory Background.....................................................11

ARGUMENT ......................................................................................................... 15

I.      THE SECTION 1960 COUNT FAILS AS A MATTER OF LAW............................... 15

    A.    Samourai Wallet Was Not a "Money Transmitting Business"............................ 16

    B.    Samourai Wallet Was Anonymizing Software That FinCEN Advised Is Not a Money Transmitting Business ..................................................... 18

    C.    The Government's Change of Position Deprived the Defendants of Fair Notice In Violation of the Due Process Clause .................................... 20

    D.    Judge Failla's Bench Order in *Tornado Cash* is Inapposite............................... 23

II.    THE SECTION 1956 COUNT FAILS AS A MATTER OF LAW............................... 25

    A.    Samourai Wallet Was Not a "Financial Institution"............................................ 27

    B.    The Indictment Does Not Allege a Legally Cognizable Conspiracy.................. 28

        1.    The Elements of a Cognizable Conspiracy............................................ 28

        2.    The Indictment Fails to Allege That the Defendants Had Knowledge of Any Conspiracy By Customers to Misuse Samourai Wallet ............................................................................................... 29

        3.    The Indictment Fails to Allege That the Defendants Had a Meeting of the Minds and Agreed to Join Any Customers' Conspiracy............... 32

CONCLUSION...................................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                    **<u>Pages:</u>**

*Bittner v. United States*,
    598 U.S. 85 (2023)................................................................................ 22

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012).............................................................................. 20

*Direct Sales Co. v. United States*,
    319 U.S. 703 (1943).............................................................................. 30

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012).............................................................................. 20

*Givelify LLC v. Dep't of Banking & Sec.*,
    210 A.3d 393 (Pa. Commw. Ct. 2019)................................................... 17

*Nielsen v. Preap*,
    586 U.S. 392 (2019).............................................................................. 22

*Preble-Rish Haiti, S.A. v. Republic of Haiti*,
    2023 WL 4210057 (S.D.N.Y. June 27, 2023)...................................... 23

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023)......................................................................... 33, 34

*United States v. $1,370,851 in U.S. Currency*,
    2010 WL 11650916 (S.D. Fla. Oct. 6, 2010)...................................... 17

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012)................................................................ 5, 23

*United States v. Alvarez*,
    610 F.2d 1250 (5th Cir. 1980).............................................................. 32

*United States v. Blankenship*,
    970 F.2d 283 (7th Cir. 1992)..................................................... 31, 32, 33

*United States v. E-Gold, Ltd.*,
    550 F. Supp. 2d 82 (D.D.C. 2008)........................................................ 12

*United States v. Falcone*,
    109 F.2d 579 (2d Cir. 1940)........................................................... 29, 30

ii

*United States v. Falcone*,
    311 U.S. 205 (1940) ................................................................................ 30

*United States v. Garcia*,
    587 F.3d 509 (2d Cir. 2009) ................................................................... 28

*United States v. Harmon*,
    474 F. Supp. 3d 76 (D.D.C. 2020) .................................................. *passim*

*United States v. Harra*,
    985 F.3d 196 (3d Cir. 2021) ................................................................... 21

*United States v. Heicklen*,
    858 F. Supp. 2d 256 (S.D.N.Y. 2012) ................................................ 5, 9

*United States v. Henry*,
    325 F.3d 93 (2d Cir. 2003) ..................................................................... 26

*United States v. Lorenzo*,
    534 F.3d 153 (2d Cir. 2008) ................................................................... 28

*United States v. Maldonado-Rivera*,
    922 F.2d 934 (2d Cir. 1990) ................................................................... 33

*United States v. Ness*,
    565 F.3d 73 (2d Cir. 2009) ..................................................................... 27

*United States v. Ogando*,
    547 F.3d 102 (2d Cir. 2008) ................................................................... 28

*United States v. Penn. Indus. Chem. Corp.*,
    411 U.S. 655 (1973) ................................................................................ 22

*United States v. Pilipis*,
    2025 WL 486604 (S.D. Ind. Feb. 13, 2025) ........................................ 16

*United States v. Pirro*,
    212 F.3d 86 (2d Cir. 2000) ....................................................................... 5

*United States v. Rosenblatt*,
    554 F.2d 36 (2d Cir. 1977) ..................................................................... 28

*United States v. Superior Growers Supply, Inc.*,
    982 F.2d 173 (6th Cir. 1993) ................................................................. 30

*United States v. Tohono O'Odham Nation*,
    563 U.S. 307 (2011) ................................................................................ 25

*United States v. Velastegui*,
199 F.3d 590 (2d Cir. 1999) ...................................................................... 17

*Van Loon v. Dep't of the Treasury*,
122 F.4th 549 (5th Cir. 2024) .................................................................... 11

**Statutes, Rules & Regulations**

18 U.S.C. § 1956 ..................................................................................... *passim*

18 U.S.C. § 1956(a)(1)(B)(i) ............................................................... 4, 26, 27

18 U.S.C. § 1956(c)(4)(B) ........................................................................ 4, 27

18 U.S.C. § 1956(c)(6)(A) ............................................................................ 27

18 U.S.C. § 1956(h) ...................................................................................... 25

18 U.S.C. § 1960 ..................................................................................... *passim*

18 U.S.C. § 1960(b) ...................................................................................... 15

18 U.S.C. § 1960(b)(1)(B) ................................................................. 12, 16, 18

18 U.S.C. § 1960(b)(1)(C) ................................................................. 12, 16, 18

18 U.S.C. § 1960(b)(2) ....................................................................... 12, 16, 24

31 U.S.C. § 5312(a)(2) .................................................................................. 27

31 U.S.C. § 5312(a)(2)(R) ............................................................................ 27

31 U.S.C. § 5330 ..................................................................................... *passim*

31 U.S.C. § 5330(a)(1) .................................................................................. 13

31 U.S.C. § 5330(d)(1) .................................................................................. 27

31 U.S.C. § 5330(d)(2) ............................................................................ 13, 19

31 U.S.C. § 5330(d)(1)(A) ...................................................................... *passim*

31 C.F.R. § 1010.100(ff)(5)(i)(A) ................................................................ 13

31 C.F.R. § 1010.100(ff)(5)(ii) ................................................................ 13, 19

88 Fed. Reg. 72701 (2024) ............................................................................. 5

Fed. R. Crim. P. 12(b)(3) ........................................................................ 3, 5


**Other Authorities**

Shawn Amuial, *The Blockchain: A Guide for Legal & Business Professionals* §
    1:3 (Nov. 7, 2016) .............................................................................. 6

Nicholas Anthony, *The Blockchain Integrity Act: Latest Attempt to Restrict
    Financial Privacy*, Cato Institute (May 9, 2024) ................................. 5

Daniel Barabander et al., *Through the Looking Glass: Conceptualizing Control
    and Analyzing Criminal Liability for Unlicensed Money Transmitting
    Businesses Under Section 1960,* Int'l Acad. of Fin. Crim Litigators, (Dec.
    2024) ............................................................................... 12, 17, 25

Brad Bourque, *The Crypto Wars and the Future of Financial Privacy,*
    Fordham J. of Corp. & Fin. L. (Mar. 31, 2023) ................................... 8

Andrew Chow, *A New U.S. Crackdown Has Crypto Users Worried About Their
    Privacy*, Time, (Aug. 10, 2022) ...................................................... 7

Leigh Cuen, *Sexual Assault Survivor Uses Crypto to Crowdfund Anonymously,*
    CoinDesk (Sept. 13, 2021) ............................................................... 8

Cybersecurity & Infrastructure Security Agency, *Cybersecurity Advisory:
    Russian State-Sponsored and Criminal Cyber Threats to Critical
    Infrastructure*, (May 9, 2022) ........................................................ 8

FinCEN Administrative Ruling FIN2014-R001, *Application of FinCEN
    Regulations to Virtual Currency Mining Operations,* FinCEN Administrative
    Ruling FIN 2014-R001, (Jan. 30, 2014) ........................................ 2, 14

FinCEN Guidance, FIN-2019-G001, *Application of FinCEN's Regulations to
    Certain Business Models Involving Convertible Virtual Currencies* § 4.5.1
    (May 9, 2019) .......................................................................... *passim*

FinCEN Guidance, FIN-2019-G001, *Application of FinCEN's Regulations to
    Certain Business Models Involving Convertible Virtual Currencies* § 4.5.1(a)
    (May 9, 2019) ............................................................................. 15

FinCEN Guidance, FIN-2019-G001, *Application of FinCEN's Regulations to
    Certain Business Models Involving Convertible Virtual Currencies* § 4.5.1(b)
    (May 9, 2019) .......................................................................... *passim*

Geoff Goodell & Tomaso Aste, *Can Cryptocurrencies Preserve Privacy and Comply with Regulations,* Frontiers in Blockchain, (May 28, 2019) .................................... 8

Gruenstein et. al., *Secret Notes and Anonymous Coins: Examining FinCEN's 2019 Guidance on Money Transmitters in the Context of the Tornado Cash Indictment* (Sept. 2023) ................................................................................. 20

KelmanPLLC, *Navigating FinCEN's Latest Guidance* (Feb. 16, 2024) .................................... 2

King & Spalding LLP, *Tying It All Together: FinCEN Consolidates Several Years of Cryptocurrency Guidance* (May 21, 2019) ........................................ 2

*Known Physical Bitcoin Attacks*, (2018)
https://github.com/jlopp/physical-bitcoin-attacks ................................................ 7

Morgan Lewis LLP, *FinCEN Issues Guidance on Crypto*, (May 21, 2019) ............................... 2

Letter from Senators Lummis & Wyden to U.S. Attorney General Merrick Garland (May 9, 2024) ............................................................................ 3, 5, 18

Letter to Senate Committee on Banking et al. from Industry Participants, (Mar. 26, 2025) ....................................................................................... 3

Popper, *Bitcoin Thieves Threaten Real Violence for Virtual Currencies*, N.Y. Times, (Feb. 18, 2018) ........................................................................... 7

Rob Price, *Kidnapped for Crypto: Criminals See Flashy Crypto Owners as Easy Targets, and it has Led to a Disturbing String of Violent Robberies*, Bus. Insider, (Feb. 9, 2022) ...................................................................... 7

Bradley Rettler, *How Bitcoin CoinJoins Help Facilitate Pro-Democracy Protests*, Forbes, (Oct. 9, 2024) ........................................................................ 8

Scott Reeves, *46 Million Americans Now Own Bitcoin, as Crypto Goes Mainstream*, Newsweek, (May 11, 2021) ........................................................ 6

Katherine Ross & Michael McSweeny, *The DOJ's About-Face on Money Transmitters,* Blockworks, (May 6, 2024) ................................................... 3

Nadler & Schar, *Tornado Cash and Blockchain Privacy: A Primer for Economists and Policymakers, Fed. Reserv. Bank of St. Louis* (2023) ................................ 6, 7

Schnoering et al., *Heuristics for Detecting CoinJoin Transactions on the Bitcoin Blockchain,* ResearchGate (Nov. 21, 2023) ............................................... 7, 8

Seth For Privacy, *How Samourai Wallet Worked and Why it Matters*, FreedomTech, (Apr. 26, 2024) ............................................................... 3, 11

*Transfer*, Merriam-Webster Online, https://www.merriam-
webster.com/dictionary/transfer, Oxford English Dictionary (3d ed. 2002) ........................ 16

Valkenburgh, *DOJ's New Stance on Crypto Wallets is a Threat to Liberty and the
Rule of Law,* Coin Center, (Apr. 29, 2024) .......................................................................... 3

Gary Weinstein, *AI and Blockchain Analytics: The Urgent Need for Crypto
Privacy Tool*, Forbes, (Apr. 7, 2023) ................................................................................... 8

## INTRODUCTION

The indictment against Defendants Keonne Rodriguez and William Lonergan Hill alleges conduct that is lawful under the relevant statutes and the government's own longstanding interpretation of those statutes. The Court should therefore dismiss both counts as a matter of law.

The indictment centers on a mobile phone application for Bitcoin users called Samourai Wallet. The DOJ alleges that the app was an "unlicensed money transmitting business" designed as a haven for money launderers. But the federal agency charged with determining whether an entity is a money transmitting business that must be licensed—the Treasury Department's Financial Crimes Enforcement Network ("FinCEN")—has long advised that privacy software applications like Samourai Wallet are *not* "money transmitters" requiring a license. And far from the money-laundering bogeyman portrayed by DOJ, Samourai Wallet was overwhelmingly used—by tens of thousands of everyday people—for a legitimate purpose: to keep their private financial information private.

Cryptocurrency poses unique privacy concerns. Unlike traditional credit card, ATM, checking, or other financial transactions—which are recorded on customers' *private* bank statements or financial institutions' *private* ledgers—every single cryptocurrency transaction is recorded on a *public* ledger called the "blockchain." The blockchain can be viewed by anyone with an internet connection. As a result, criminals scour the blockchain to identify accounts with sufficient assets, then target account holders for fraud, scams, hacking, and even violent crime.

Samourai Wallet and similar apps known as CoinJoins provided a solution to this problem. Samourai empowered cryptocurrency users to communicate with one another and pool their transactions, making it more difficult to identify users' individual transactions and identities on the public blockchain. Essentially, Samourai allowed users to avoid posting the cryptocurrency-equivalent of their private credit card or bank statements on the internet for all the world to see.

Samourai Wallet operated openly in the market for nearly a decade from 2015 through 2024, available on the Google Play Store. During that entire period, FinCEN never maintained that it was a money transmitting business that must be licensed. To the contrary, FinCEN consistently advised that companies and software apps that did not "accept" or "transmit" funds were not "money transmitting" businesses. For example, in January 2014—before Samourai Wallet launched—FinCEN advised that activities "involv[ing] neither 'acceptance' nor 'transmission' of the convertible virtual currency . . . are not the transmission of funds" requiring registration. FinCEN Administrative Ruling FIN2014-R001, *Application of FinCEN Regulations to Virtual Currency Mining Operations*, at *3 (Jan. 30, 2014). And in May 2019, FinCEN explicitly confirmed that "anonymizing software"—like Samourai Wallet—"is not a money transmitter" because it is "engaged in trade and not money transmission." FinCEN Guidance, FIN-2019-G001, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies* § 4.5.1(b) (May 9, 2019). Based on the plain text of the statutes and FinCEN's consistent guidance, everyone from prominent industry lawyers[1] to cryptocurrency

---

[1]  *E.g.*, Covington & Burling, *FinCEN Issues Guidance to Synthesize Regulatory Framework for Virtual Currency*, Nov. 2019 ("[O]wners of unhosted wallets—computer software that allows owners to store and conduct [cryptocurrency] transactions—are not money transmitters"); King & Spalding LLP, *Tying It All Together: FinCEN Consolidates Several Years of Cryptocurrency Guidance*, (May 21, 2019) (similar); Morgan Lewis LLP, *FinCEN Issues Guidance on Crypto*, May 21, 2019 (similar); *accord* KelmanPLLC, *Navigating FinCEN's Latest Guidance*, (Feb. 16, 2024) ("In contrast, anonymizing software providers are exempt from the definition of money transmitter as those persons providing 'the delivery, communication, or network access services used by a money transmitter to support money transmission services.'").

experts[2] to major industry participants,[3] to members of Congress[4] understood that software like Samourai Wallet did not qualify as money transmitting businesses.

Nevertheless, out of the blue in 2024, the DOJ—in an apparent regulatory power struggle with FinCEN—departed from the settled interpretation of "money transmitting business" and determined that noncustodial privacy apps like Samourai Wallet *are* money transmitters, and initiated this highly controversial prosecution.

The DOJ charged the Defendants with (1) conspiring to operate "an unlicensed money transmitting business" in violation of 18 U.S.C. § 1960; and (2) conspiring with unidentified Samourai Wallet users to commit money laundering in violation of 18 U.S.C. § 1956. The indictment is legally defective on its face and should be dismissed as a matter of law under Federal Rule of Criminal Procedure 12(b)(3).

*First*, the Defendants did not operate a "money transmitting business," a threshold requirement for any conspiracy to violate Section 1960. The indictment itself alleges that

---

[2] *E.g.*, Katherine Ross & Michael McSweeny, *The DOJ's About-Face on Money Transmitters*, Blockworks, (May 6, 2024), ("Under clear and long established FinCEN guidance and under any common sense reading of the underlying law," noncustodial wallets "are not money transmitters" (quoting cryptocurrency expert Peter Van Valkenburgh)); Valkenburgh, *DOJ's New Stance on Crypto Wallets is a Threat to Liberty and the Rule of Law*, Coin Center, (Apr. 29, 2024) ("It has been the clear and consistent policy of the U.S. government since at least 2013 that cryptocurrency wallet developers and the users of those wallets are not money transmitters"); Seth for Privacy, *How Samourai Wallet Worked and Why It Matters*, FreedomTech, (Apr. 26, 2024) (Samourai not a money transmitter because it "never had the ability to take custody of user's funds, never had the ability to alter the flow of funds, and ultimately acted as a simple message passer in functionality.").

[3] *E.g.*, Letter to Senate Committee on Banking et al. from Industry Participants, (Mar. 26, 2025) ("The DOJ's new policy position, first debuted in August 2023 via criminal indictment, creates confusion and ambiguity with the spectre of criminal liability, and ultimately threatens the viability of U.S.-based software development in the digital asset industry and other industries.").

[4] Letter from Senators Lummis and Wyden to U.S. Attorney General Merrick Garland, (May 9, 2024) ("Consistent with Congress' intent, statutory language and existing regulations, FinCEN has consistently taken this same position in published guidance that non-custodial services are not within the scope of money transmission registration requirements.").

Samourai Wallet never exercised custody or control over app users' cryptocurrency.  Indictment ¶ 13.  Thus, the app could not and did not "transfer," "accept," or "transmit" any currency, which is the *sine qua non* of a money transmitter.  The indictment also asserts that Samourai Wallet was privacy "software," Indictment ¶ 13, but ignores FinCEN's longstanding guidance that "suppliers of . . . anonymizing software" are not money transmitters.

*Second*, the Defendants did not conspire with users of Samourai Wallet to commit money laundering under Section 1956.  For one, the indictment alleges that the Defendants violated Section 1956 by using a "financial institution" to conceal or disguise proceeds of specified unlawful activity.  Indictment ¶ 30.  But Samourai Wallet was an app, not a "financial institution" as defined by the statute.  18 U.S.C. §§ 1956(a)(1)(B)(i), (c)(4)(B).  Because it was not a financial institution, moreover, it was not required to implement anti-money laundering controls under the Bank Secrecy Act.  Thus, as a threshold matter, the count fails as a matter of law.

For another, DOJ's theory—that a person or business engages in a "conspiracy" with customers simply by allegedly knowing that some small segment of their customers will misuse their product—contravenes longstanding Supreme Court precedent and common sense.  It's akin to charging an encrypted messaging app developer with conspiracy because it may know that some customers use the app to communicate about financial crimes.  Or charging a burner phone manufacturer because it may know some customers use the phones to facilitate drug crimes.  Or charging a shovel manufacturer because it may know murderers use shovels to bury victims— etcetera, etcetera, etcetera.

If DOJ wants to adopt a new policy for non-custodial anonymizing software apps, the proper course is not unprecedented criminal charges.  Rather, such a sea change must occur through the legislative and rulemaking process.  Indeed, both Republican and Democratic United States

4

Senators have decried *this prosecution* as an "unprecedented interpretation of" the applicable statutes and regulations that "contradicts the clear intent of Congress and the authoritative guidance of [FinCEN]."[5]  Members of Congress have recently proposed bills,[6] and FinCEN is engaged in notice-and-comment rulemaking, concerning further regulation of anonymizing apps.[7]  This prosecution is an end run around not only these processes, but also due process of law, which mandates that citizens receive fair notice as to what activities constitute a crime.  The Court should dismiss the indictment in its entirety.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12(b)(3), a criminal defendant may move to dismiss based on a "defect in the indictment," which includes "failure to state an offense."

"Since federal crimes are 'solely creatures of statute,' a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012).  Thus, though indictments are dismissed sparingly, courts have not hesitated to dismiss indictments as a matter of law where the charges are based on an erroneous interpretation of the scope of a criminal statute.  *Id.*  (affirming dismissal of indictment based on legally incorrect interpretation of terms "goods," "wares," or "merchandise" under National Stolen Property Act); *United States v. Pirro*, 212 F.3d 86, 92-93 (2d Cir. 2000) (affirming dismissal of indictment based on legally incorrect interpretation of terms in criminal tax statutes); *United States v. Heicklen*, 858 F. Supp. 2d 256, 275-76 (S.D.N.Y.

---

[5]  *See supra* n.4.

[6]  *See* Nicholas Anthony, *The Blockchain Integrity Act: Latest Attempt to Restrict Financial Privacy*, Cato Institute (May 9, 2024).

[7]  *See* Proposal of Special Measure Regarding Convertible Virtual Currency Mixing, as a Class of Transactions of Primary Money Laundering Concern, 88 Fed. Reg. 72701 (2024).

2012) (dismissing indictment based on prosecution's legally incorrect interpretation of "issue or matter" in statute prohibiting attempts to influence jurors). That is the proper course here.

## BACKGROUND

### A. Cryptocurrency, Privacy, and CoinJoin Apps

Cryptocurrency is a digital system of money used by tens of millions of Americans. Scott Reeves, *46 Million Americans Now Own Bitcoin, as Crypto Goes Mainstream*, Newsweek, (May 11, 2021). Thousands of American businesses now accept cryptocurrency as a form of payment. *E.g.*, *The Use of Cryptocurrency in Business*, Deloitte, June 2023.

Bitcoin is a type of cryptocurrency. *United States v. Harmon*, 474 F. Supp. 3d 76, 80 (D.D.C. 2020). "Transferring or otherwise using a bitcoin requires an address, a public encryption key, and a private encryption key." *Id.* "To transfer bitcoin from one address to another, the sender transmits a message—called a transaction—on the Bitcoin public network." *Id.* (citing *The Law of Bitcoin* 31 (Stuart Hoegner ed., 2015)). "The transaction must contain: (1) the amount of bitcoin to be transferred; (2) the address to which the bitcoin will be sent; (3) the address from which the bitcoin is being sent; and (4) the public key associated with the sender and the sending address." *Id.* (citing Shawn Amuial, *The Blockchain: A Guide for Legal & Business Professionals* § 1:3), (Nov. 7, 2016). "With these elements in place, the sender must sign the transaction using a digital signature generated using the sender's private key." *Id.*

One of the features that makes Bitcoin unique is that it operates on an open and decentralized blockchain. *E.g.*, Nadler & Schar, *Tornado Cash and Blockchain Privacy: A Primer for Economists and Policymakers*, Fed. Reserv. Bank of St. Louis (2023). Once a user makes a transaction, "that transaction is eventually recorded on a blockchain, a public ledger that records

6

every bitcoin transaction." *Harmon*, 474 F. Supp. 3d 76, 80. The blockchain is like a bank's ledger in that it records all transactions.

But unlike a bank's ledger, the blockchain is public. "If someone obtains information that allows them to link a blockchain address to an entity, they may effectively observe that entity's entire transaction history and associated activity." Nadler & Schar, *supra*. "All transactions are visible on the blockchain and can thus be scrutinized." Schnoering et al., *Heuristics for Detecting CoinJoin Transactions on the Bitcoin Blockchain*, ResearchGate (Nov. 21, 2023). As such, "it is possible to track users' funds, jeopardizing their right to privacy." *Id.*

Though Bitcoin users are identified only by digital addresses, often those addresses can easily be linked to specific people or businesses. An entire industry has arisen to do just that. Companies analyze blockchain transactions to identify the people behind them. Users themselves disclose their Bitcoin addresses when they conduct transactions. And, following data breaches or other events that can connect personally identifiable information to a Bitcoin address, thieves, hackers, and other wrongdoers search the blockchain and target cryptocurrency users for financial and even violent crime.[8] Physical attacks on cryptocurrency users have been rampant.[9] And donors to politically-charged causes who use cryptocurrency can be identified and face

---

[8] *E.g.*, Rob Price, *Kidnapped for Crypto: Criminals See Flashy Crypto Owners as Easy Targets, and it has Led to a Disturbing String of Violent Robberies*, Bus. Insider, Feb. 9, 2022; Nathaniel Popper, *Bitcoin Thieves Threaten Real Violence for Virtual Currencies*, N.Y. Times, Feb. 18, 2018; Andrew Chow, *A New U.S. Crackdown Has Crypto Users Worried About Their Privacy*, Time, Aug. 10, 2022.

[9] For a sample of the many reported physical attacks, see Known Physical Bitcoin Attacks, https://github.com/jlopp/physical-bitcoin-attacks.

retaliation.[10] The blockchain also presents baseline privacy concerns for ordinary citizens.[11] After all, no one would want their lifetime of bank account transactions available for the world to see, when often those transactions reveal highly personal information. *E.g.*, Leigh Cuen, *Sexual Assault Survivor Uses Crypto to Crowdfund Anonymously*, CoinDesk (Sept. 13, 2021).

That's where software like Samourai Wallet came in. While the DOJ labels such apps "mixers," Samourai Wallet's privacy tools actually are known as "CoinJoins"—"a commonly used method to bolster privacy for Bitcoin users. It involves a collaboration wherein individuals combine their transaction[s] into one large transaction. Consequently, tracking individual transfers becomes intricate." Schnoering et al., *supra*, at 2 (academic article analyzing several CoinJoin apps). These apps function without a central custodian, meaning that users retain control over their funds throughout the process, which is achieved with the users' own private keys. *See id.*; *accord* Bradley Rettler, *How Bitcoin CoinJoins Help Facilitate Pro-Democracy Protests*, Forbes, (Oct. 9, 2024) ("In a CoinJoin, users jointly construct transactions where their coins are combined and then sent out to various addresses . . . . Since it is an automatic protocol, no coordinating authority has custody of the bitcoin involved; each user retains control of their own coins throughout.").

### B.    The Samourai Wallet CoinJoin App

"Many [Bitcoin] users . . . store their private keys securely in a digital wallet, which can take the form of software or hardware." *Harmon*, 474 F. Supp. 3d at 82 (internal citations omitted).

---

[10]    Cybersecurity & Infrastructure Security Agency, *Cybersecurity Advisory: Russian State-Sponsored and Criminal Cyber Threats to Critical Infrastructure*, (May 9, 2022); Brad Bourque, *The Crypto Wars and the Future of Financial Privacy*, Fordham J. of Corp. & Fin. L. (Mar. 31, 2023).

[11]    *See* Geoff Goodell & Tomaso Aste, *Can Cryptocurrencies Preserve Privacy and Comply with Regulations*, Frontiers in Blockchain, (May 28, 2019); Gary Weinstein, *AI and Blockchain Analytics: The Urgent Need for Crypto Privacy Tool*, Forbes, (Apr. 7, 2023).

Samourai Wallet was a fully functional Bitcoin software wallet with numerous innovative software features. As set forth in the indictment,[12] the wallet included privacy features that allowed users to use CoinJoin and hop transactions. Users alone transferred their cryptocurrency to, or received cryptocurrency from, other users.

According to the indictment, "Samourai is a mobile application that users can download onto their cellphones, and the application has been downloaded over 100,000 times." Indictment ¶ 9. "After users download Samourai, they can store their private key for any BTC [*i.e.*, Bitcoin] address they control inside of the Samourai program." *Id.* Critically, the indictment acknowledges that "these private keys are not shared with Samourai employees." *Id.*

The indictment focuses on two features of Samourai. First, "Samourai offers a cryptocurrency mixing service known as 'Whirlpool,' which coordinates batches of cryptocurrency exchanges between groups of Samourai users to prevent tracing" of transactions over the blockchain. *Id.* ¶ 10. Second, "Samourai offers a service called 'Ricochet,' which allows a Samourai user to build in additional and unnecessary intermediate transactions (known as 'hops') when sending cryptocurrency from one address to another address." *Id.*

**Whirlpool.** The indictment states that Whirlpool was introduced in or around April 2019. Indictment ¶ 12. After downloading the software on their phone, the "user selects an amount of BTC that they wish to mix and the pool in which they would like to mix that BTC." *Id.* "For example, if a user wishes to contribute 1 BTC into the 0.05 pool, the Samourai software on the user's cellphone will broadcast a transaction to the blockchain transferring 1 BTC into 19 [other]

---

[12] While aspects of the indictment's description of Samourai Wallet are inaccurate, this motion assumes, as required, that the allegations in the indictment are true. *E.g.*, *Heicklen*, 858 F. Supp. 2d at 261 ("In considering a motion to dismiss, the Court relies on the indictment and accepts the allegations of the indictment as true.").

addresses, each containing approximately 0.05 BTC. . . . Each of these 19 addresses containing approximately 0.05 BTC will serve as an input in a Whirlpool transaction." *Id.* ¶ 13. Then, "the Samourai application on a user's cellphone communicates to other Samourai users, and Samourai's coordinator server randomly selects four other inputs already in the selected pool [from other users], to be mixed with the new incoming input and communicates that information to each user. The Samurai application on each user's cell phone then broadcasts a transaction to the Blockchain in which all five inputs (each a separate address) are then transferred to five outputs (each a separate address)." *Id.*

"[A]lthough the private keys for these cryptocurrency addresses are stored in each user's individual cellphone," the indictment states, the private keys are "not shared with Samourai's employees." *Id.* According to the indictment, "Samourai Wallet's role in this process is to 'pool' liquidity, making it easier to find other peers who want to mix the same size inputs, assist in communication between peers, and broadcasting the final signed transaction." *Id.* In other words, Whirlpool never transferred, accepted, or transmitted any Bitcoin; rather, users controlled and transmitted their own funds and the software simply anonymized their transactions by communicating with other users to keep them from being publicly available on the blockchain.

***Ricochet.*** While Ricochet's software operated differently from Whirlpool's CoinJoin feature, it also helped users keep their transactions private on the blockchain. The indictment contends that the Ricochet "hop" feature was introduced in or around 2017. Indictment ¶ 15. It alleges that "a Samurai user selects an amount of [Bitcoin] that they wish to send, and the destination address where it is to be sent." *Id.* .

As with the Whirlpool feature, with Ricochet "the private keys for these addresses are stored in each user's individual cellphone and not shared with Samourai's employees." *Id.*

10

In other words, like Whirlpool, Ricochet did not transfer, transmit, or accept any Bitcoin—rather, users controlled and transmitted their own funds. Ricochet simply added additional stops along the public transaction history between the sender and the recipient, thus helping keep the original sender more anonymous or difficult to identify. "Just like Whirlpool," Ricochet "never allowed Samourai Wallet to take custody of funds or alter the flow of funds at any point." *How Samourai Wallet Worked*, *supra* n.2.

Contrary to DOJ's hyperbole that CoinJoins like Samourai Wallet are aimed solely at money laundering, Indictment ¶ 1, people overwhelmingly used the software as a Bitcoin wallet and used its privacy features to maintain the confidentiality of their private financial transactions. While CoinJoins differ from so-called "mixers," both serve lawful and legitimate purposes. *See Van Loon v. Dep't of the Treasury*, 122 F.4th 549, 559 (5th Cir. 2024) ("[L]aw-abiding cryptocurrency users employ mixers to maintain anonymity concerning their net worth, spending habits, and donations to political causes. Mixers can also be used to thwart criminals that would use this information to identify potential victims or set up phishing schemes."). But in contrast with "mixers," users of CoinJoins like Samourai Wallet never surrender custody of their Bitcoin to the third party, thereby eliminating the danger that their funds could be stolen. Nor do they provide any personal identifying information to the apps—eliminating the possibility that such information could be leaked in a data breach.

## C.    Statutory and Regulatory Background

Under federal law, "money transmitting businesses" generally are required to register with FinCEN and must develop AML programs and follow certain reporting and other requirements of the Bank Secrecy Act ("BSA"). A threshold and key question in this case is whether the Samourai

Wallet app was a "money transmitting business." As explained below, if Samourai was not a money transmitting business, both counts of the indictment must be dismissed. It was not.

Under 18 U.S.C. § 1960, it is unlawful to operate or conspire to operate an unlicensed "money transmitting business" but only if that business either (a) "fails to comply with the money transmitting business registration requirements under [the Bank Secrecy Act] section 5330 of title 31, United States Code, or regulations prescribed under such section," 18 U.S.C. § 1960(b)(1)(B); or (b) "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." 18 U.S.C. § 1960(b)(1)(C).[13] Thus, "[i]n order to be guilty of a violation of Section 1960 . . . an entity must first, as a prerequisite, be a business that engages in 'money transmitting' as so defined in Section 1960(b)(2)." *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82, 90 (D.D.C. 2008); *accord* Daniel Barabander et al., *Through the Looking Glass: Conceptualizing Control and Analyzing Criminal Liability for Unlicensed Money Transmitting Businesses Under Section 1960*, Int'l Acad. of Fin. Crime Litigators (Dec. 2024, at 12-25) (discussing elements of Section 1960). Section 1960(b)(2) defines "money transmitting" as "transferring funds on behalf of the public by any and all means including but not limited to transfers . . . by wire, check, draft, facsimile, or courier."

Section 5330 of the Bank Secrecy Act—specifically referenced in 18 U.S.C. § 1960— provides that "[a]ny person who owns or controls a money transmitting business shall register the

---

[13] The indictment charges the Defendants with a conspiracy to violate Section 1960 with the objects of the conspiracy purportedly to violate Section 1960(b)(1)(B) *and* (b)(1)(C). The government has recently advised that it will not proceed on the 1960(b)(1)(B) theory.

business . . . with the Secretary of the Treasury."  31 U.S.C. § 5330(a)(1).  The statute defines "money transmitting business" as one that

> provides check cashing, currency exchange, or *money transmitting . . . services*, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the *transmission* of currency, funds, or value that substitutes for currency, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system.

*Id.* § 5330(d)(1)(A) (emphases added).  The statute defines engaging in "money transmitting . . . services," in turn, as "*accepting* currency, funds, or value that substitutes for currency and *transmitting* the currency, funds, or value that substitutes for currency by any means."  *Id.* § 5330(d)(2) (emphases added).   Thus, under Section 1960 and Section 5330, "transfer," "acceptance," and "transmission" are the *sine qua non* of a money transmission business.

FinCEN's implementing regulations underscore that transfer, acceptance, and transmission of funds are prerequisites to being a money transmitting business.  The governing regulation states that money transmission "means the *acceptance* of currency, funds, or other value that substitutes for currency from one person *and* the *transmission* of currency, funds, or other value that substitutes for currency to another location or person by any means."  31 C.F.R. § 1010.100(ff)(5)(i)(A) (first and third emphases added).  The regulation explicitly excludes from the definition of "money transmitter" a person who merely "provides the delivery, communication, or network access services used by a money transmitter to support money transmission services." *Id.* § 1010.100(ff)(5)(ii)(A).

FinCEN's consistent rulings and guidance likewise have focused on acceptance and transmission of funds and have explicitly advised industry participants that privacy software that does not take custody of funds is not a money transmitting businesses.  In 2014, FinCEN published

13

an administrative ruling explaining that activities that "involve neither 'acceptance' nor 'transmission' of the convertible virtual currency . . . are not the transmission of funds within the meaning of the Rule." *Application of FinCEN Regulations to Virtual Currency Mining Operations*, FinCEN Administrative Ruling FIN 2014-R001 (Jan. 30, 2014) at 3. In 2019, FinCEN published a detailed guidance—titled "Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies"—"to remind persons . . . how FinCEN regulations . . . apply to certain business models involving [cryptocurrency]." *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN 2019-G001 (May 9, 2019), at 1 ("FinCEN 2019 Guidance"). The guidance reiterated that "money transmission services . . . mean the *acceptance* of currency . . . from one person *and the transmission of* currency . . . to another location or person by any means." *Id.* § 1.2.1. Likewise, a "money transmitter" is a person whose "activities include *receiving* one form of value [including cryptocurrency] from one person and *transmitting* either the same or a different form of value to another person or location, by any means." *Id.* § 2 (emphases added).

In a section concerning the "Transmission of [cryptocurrency]," FinCEN observed that "a person still qualifies as a money transmitter if that person's activities include *receiving* [cryptocurrency] from one person and *transmitting* [it] to another person or location." *Id.* (emphases added). Critically, FinCEN emphasized that an "anonymizing software provider is not a money transmitter." *Id.* § 4.5.1(b). In particular, FinCEN distinguished between "anonymizing *services* providers," sometimes called "mixers," and "anonymizing *software* provider[s]." *Id.* § 4.5.1. An anonymizing *service* provider "accept[s cryptocurrencies] and retransmit[s] them in a manner designed to prevent others from tracing the transmission back to [the] source." *Id.* § 4.5.1.

These are money transmitting businesses because they "accept[] value from a customer and transmit[]the same or another type of value to the recipient." *Id.* § 4.5.1(a).

By contrast, "FinCEN regulations exempt from the definition of money transmitter those persons providing 'the delivery, communication, or network access services used by a money transmitter to support money transmission services.'" *Id.* § 4.5.1(b) (quoting 31 CFR § 1010.100(ff)(5)(ii)). "This is because suppliers of tools (communications, hardware, or software) that may be utilized in money transmission, *like anonymizing software*, are engaged in trade and not money transmission." *Id.* (emphasis added). Thus, an "anonymizing *software* provider is *not* a money transmitter." *Id.* (emphases added).

As explained below, Samourai Wallet never transferred, transmitted, or accepted cryptocurrency. It had features, including "anonymizing software" that allowed users to pool transactions or make hops to help anonymize their transactions on the blockchain to maintain their privacy. But the users at all times maintained custody of their Bitcoin. And it was therefore precisely the type of software the federal government, through FinCEN, advised the Defendants and other industry participants was *not* a money transmitting business.

Furthermore, the Defendants did not know whether any user's transportation or transmission of funds involved funds derived from a criminal offense. Nor could they. Samourai Wallet's users never disclosed their identities or the purpose of their transactions—perhaps the most important benefit of using a privacy wallet.

## ARGUMENT

## I.    THE SECTION 1960 COUNT FAILS AS A MATTER OF LAW

The indictment charges the Defendants with conspiracy to operate an "unlicensed money transmitting business" under 18 U.S.C. § 1960(b). The indictment initially identified two

15

purported objects of the conspiracy: (1) to violate 18 U.S.C. § 1960(b)(1)(B), which defines "unlicensed money transmitting business" as one which "fails to comply with the money transmitting business registration requirements under [31 U.S.C. § 5330], or regulations prescribed under such section"; and (2) to violate 18 U.S.C. § 1960(b)(1)(C), which defines "unlicensed money transmitting business" as one which "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." *See* Indictment ¶¶ 1, 31-34. The government has since advised that it does not intend to proceed on its Section (b)(1)(B) theory.

Regardless, "[i]n order to have violated either § 1960(b)(1)(B) or § 1960(b)(1)(C), [a defendant] had to have been considered a 'money transmitting business.'" *United States v. Pilipis*, 2025 WL 486604, at *4 (S.D. Ind. Feb. 13, 2025). Thus, the threshold question before considering any violation of Section (b)(1)(B) or (b)(1)(C) is whether Samourai Wallet was a "money transmitting business." If not, the 1960 count must be dismissed.

### A.    Samourai Wallet Was Not a "Money Transmitting Business"

Section 1960 defines "money transmitting" as "transferring funds on behalf of the public by any and all means including but not limited to transfers . . . by wire, check, draft, facsimile, or courier." *Id.* § 1960(b)(2). A money transmitting business, then, is a business engaged in "transferring funds on behalf of" someone to someone else. Though "transferring" is not defined in the statute, the ordinary meaning of "transfer" is "to convey from one person, place, or situation to another." *Transfer*, Merriam-Webster Online, https://www. merriam-webster.com/dictionary/transfer; *accord Transfer*, Oxford English Dictionary (3d ed. 2002) ("The

16

act of transferring or fact of being transferred; conveyance or removal from one place, person, etc. to another; transference; transmission.").

Applying the ordinary meaning of "transfer," courts have thus held that Section 1960 "seemingly require[s] a money transmitting business to move funds from one person or place to another." *Harmon*, 474 F. Supp. 3d at 103; *accord* Barabander, *supra*, at 16 n.47 (surveying case law and "not identify[ing] a single . . . case where a party was 'money transmitting' under Section 1960 and did not obtain and relinquish control over funds"). As the Second Circuit has explained, a money transmitting business is one that "*receives* money from a customer and then, for a fee paid by the customer, *transmits* that money to a recipient." *United States v. Velastegui*, 199 F.3d 590, 592 (2d Cir. 1999) (emphasis added). And other courts have repeatedly held that money transmission requires the "movement of funds" by the defendant. *United States v. $1,370,851 in U.S. Currency*, 2010 WL 11650916, at *5 (S.D. Fla. Oct. 6, 2010) (Section 1960 requires that defendant "transmitted money received or belonging to others"); *Givelify LLC v. Dep't of Banking and Sec.*, 210 A.3d 393, 401-02 (Pa. Commw. Ct. 2019) (software provider did not "transmit" money under state counterpart to Section 1960 because funds were "never deposited into an account directly owned or controlled by petitioner").

Here, the indictment does not allege that Samourai Wallet or the Defendants transferred cryptocurrency on behalf of someone to someone else. As the indictment alleges, "the Samourai application on a user's cellphone *communicates* with other Samourai users" to help users pool transactions to make them less visible on the blockchain. Indictment ¶ 13 (emphasis added). But, critically, "the private keys for the[] cryptocurrency addresses" to which *users* transmitted funds were "stored in each user's individual cellphone and not shared with Samourai's employees." *Id.* Samourai's role in the transaction was limited to a coordinating server. The app was therefore non-

17

custodial, meaning *users*—not Samourai Wallet or its providers—transmitted their own cryptocurrency and simply used the app to maintain the privacy of their financial transactions.

As members of Congress recognized in criticizing this indictment against the Defendants: "The DOJ's unprecedented interpretation of this statute in the context of non-custodial crypto asset software services contradicts the clear intent of Congress and the authoritative guidance of [FinCEN]. This interpretation threatens to criminalize Americans offering non-custodial crypto asset software services." Letter from Senators Lummis & Wyden to U.S. Attorney General Merrick Garland (May 9, 2024). Contrary to DOJ's interpretation, "non-custodial crypto service providers cannot be classified as money transmitter businesses because users of such services retain sole possession and control of their crypto assets." *Id.* The indictment thus fails out of the gate because Samourai Wallet is not a "money transmitting business," the threshold requirement under Section 1960.

### B. Samourai Wallet Was Anonymizing Software That FinCEN Advised Is Not a Money Transmitting Business

The government's longstanding interpretation of who must be registered as a "money transmitter" reinforces that Samourai Wallet was not a "money transmitting business" under Section 1960.

As noted, a "money transmitting business" can only be liable under Section 1960 if it (1) "fails to comply with the money transmitting business registration requirements under [31 U.S.C. § 5330], or regulations prescribed under such section," 18 U.S.C. § 1960(b)(1)(B); or (2) "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." 18 U.S.C. § 1960(b)(1)(C).

The text and FinCEN's guidance on these provisions further confirms that Samourai Wallet was not a "money transmitting business." Section 5330 defines a "money transmitting business" as any business that provides "money transmitting. . . services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of currency." 31 U.S.C. § 5330(d)(1)(A). The statute defines "money transmitting service[s]," in turn, as "*accepting* currency, funds, or value that substitutes for currency and *transmitting* the currency, funds, or value that substitutes for currency by any means." *Id*. § 5330(d)(2). To "accept" something means to "receive (something offered) willingly" or to "take or receive (something offered)." *Accept*, Merriam-Webster. To "transmit" means "to send or convey from one person or place to another." *Transmit*, Merriam-Webster. For the reasons discussed, just as Samourai Wallet did not "transfer" funds, it did not "accept" or "transmit" currency.

Indeed, Samourai Wallet was precisely the type of business that FinCEN advised the industry is *not* a money transmitting business. As noted, FinCEN regulations specify that an entity that merely "[p]rovides the delivery, *communication*, or network accesses services used by a money transmitter to support money transmission services" does not itself qualify as a "money transmitting business" under Section 5330. 31 C.F.R. § 1010.100(ff)(5)(ii)(A) (emphasis added).

Were that not enough, FinCEN's guidance couldn't have been clearer: "An anonymizing software provider is not a money transmitter." FinCEN 2019 Guidance § 4.5.1(b). Again, FinCEN specifically distinguished between "anonymizing *services* providers"—so-called mixers where users transmit funds through a third-party service that anonymizes the transaction—with "anonymizing *software* provider[s]" that cryptocurrency owners "would use for the same purpose[.]" *Id*. § 4.5.1 (emphases added). An "anonymizing *software* provider is *not* a money

transmitter" because, again, it does not accept or transmit currency. *Id.* § 4.5.1(b); *see also* Gruenstein et. al., *Secret Notes and Anonymous Coins: Examining FinCEN's 2019 Guidance on Money Transmitters in the Context of the Tornado Cash Indictment,* Int'l Acad. of Fin. Crime Litigators, (Sept. 2023), at 8 ("[T]o act as a money transmitter, a party must have necessary and sufficient control over the value being transmitted.").

### C.    The Government's Change of Position Deprived the Defendants of Fair Notice In Violation of the Due Process Clause

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 & n.15 (2012) ("[A]gencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires'").

"This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *F.C.C. v. Fox*, 567 U.S. at 253. "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.*

In *F.C.C. v. Fox*, for instance, the Federal Communications Commission in 2001 had issued guidance that a key consideration on whether a television broadcast was "actionably indecent" was "whether the material dwelled on or repeated at length the offending description or depiction." *Id.* at 254. Three years later, "the Commission changed course and held that fleeting expletives could be a statutory violation." *Id.* The Commission charged broadcasters with violating the "fleeting expletives" standard even though the broadcasts had occurred before the Commission changed

course from its prior standard. *Id.* The Supreme Court held this violated due process. "The Commission's lack of notice to Fox and ABC that its interpretation had changed so the fleeting moments of indecency contained in their broadcasts were a violation of [the governing statute] as interpreted and enforced by the agency fail[ed] to provide a person of ordinary intelligence fair notice of what is prohibited." *Id.* (citations omitted); *accord United States v. Harra*, 985 F.3d 196, 212-213 (3d Cir. 2021) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.") (citing cases reversing convictions based on lack of fair notice).

For similar reasons, the prosecution here violates the Defendants' due process rights. During the near decade Samourai Wallet operated, the government, through FinCEN, consistently advised that companies and software apps that did not "accept" or "transmit" funds were not "money transmitting" businesses requiring a license. *See supra.* The FinCEN 2019 Guidance could not have been more clear when it confirmed that custodial "mixers" (services that accepted and transmitted funds from users) were money transmitting businesses, while noncustodial anonymizing software providers ("suppliers of software a transmittor [the cryptocurrency owner] would use for the same purpose") were not. FinCEN 2019 Guidance § 4.5.1. To change course now would be to deprive the Defendants' fair notice and due process of law since Samourai Wallet, as the indictment itself alleges, was "software" employed by users to anonymize their transactions.

Indeed, the DOJ has recently observed through the so-called "Blanche Memo" that "the prior Administration used the Justice Department to pursue a reckless strategy of regulation by prosecution, which was ill conceived and poorly executed." Memorandum from the Deputy Attorney General on Ending Regulation by Prosecution (Apr. 7, 2025). The Blanche Memo noted that DOJ would "no longer target virtual currency exchanges, mixing and tumbling services, and

offline wallets for the acts of their end users . . . ."  DOJ should have dismissed this case under that directive, but at a minimum, the Blanche Memo reflects that industry participants like the Defendants were caught in the crossfire between the DOJ's aggressive new regulatory position and FinCEN's longstanding approach to anonymizing software like Samourai Wallet.  In all events, the DOJ's sudden "reckless strategy of regulation by prosecution," deprived the Defendants of fair notice.  *Id.*

If there were any doubt, the Court should construe Sections 1960 in Defendants' favor under established canons of construction.  One, the doctrine of constitutional avoidance demands that the Court interpret the statute in a way that avoids doubts about its constitutionality.  *Nielsen v. Preap*, 586 U.S. 392, 418-419 (2019).  The only way to avoid doubts about the constitutionality of the laws here is to reject DOJ's newfound interpretation, which would deprive the Defendants and other software developers of fair notice as to the conduct that was prohibited.

Two, where "the government has repeatedly issued guidance to the public at odds with the interpretation it now asks [the court] to adopt," there is reason "to question whether its current position represents the best view of the law."  *Bittner v. United States*, 598 U.S. 85, 97 (2023).  Moreover, where the relevant federal regulator has consistently interpreted a statute to mean one thing, "there can be no doubt that traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding with the prosecution" based on a *different* interpretation.  *United States v. Penn. Indus. Chem. Corp.*, 411 U.S. 655, 674 (1973).  That is precisely the case here.

Three, under the rule of lenity, "when [a] choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before [courts] choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite."

*Aleynikov*, 676 F.3d at 82.  Here, that would mean choosing the interpretation that non-custodial apps like Samourai Wallet are not "money transmitting businesses."

### D.    Judge Failla's Bench Order in *Tornado Cash* is Inapposite

In the only other prosecution of this kind, DOJ has similarly urged an unprecedented interpretation of "money transmitting business" in a case called *Tornado Cash*.[14]  In September 2024, Judge Failla issued an unwritten order from the bench that "somewhat summarily" denied the defendant's motion to dismiss.[15]  Putting aside that one district court's decision is not binding on another,[16] the summary ruling is inapposite here.

*First*, Judge Failla found that the defendant proffered "factual arguments," which are not permissible on a motion to dismiss. Tr. at 18-20.  Here, by contrast, the challenge is to the face of the indictment, taking all the allegations in the indictment—including the description of Samourai Wallet—as true.  *See supra* n.12.  Further, *Tornado Cash* did not involve a CoinJoin, but instead, fundamentally different applications.

*Second*, Judge Failla found that the Section 1960 claim against the defendant there should not be dismissed for various reasons that do not bear on this case.  The court concluded that it was "required to accept at this stage the allegations of the indictment that the charged money transmitting business included conduct of Tornado Cash's founders and network of relayers, and not merely the pool." Tr. at 21.  But in the present case, the indictment alleges that Samourai

---

[14]  Unsealed Indictment, *United States v. Roman Storm, et al.*, No. 23-CR-430 (KPF) (S.D.N.Y. Aug. 21, 2023), ECF No. 1.

[15]  *See* Transcript of Sept.r 25, 2024 Conference ("Tr.") at 17, *United States v. Roman Storm, et al.*, No. 23-CR-430 (KPF) (S.D.N.Y. Oct. 3, 2024), ECF No. 84.

[16]  *Preble-Rish Haiti, S.A. v. Republic of Haiti*, 2023 WL4210057, at *1 (S.D.N.Y. June 27, 2023)("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (citations omitted)).

Wallet was a pool that *users*, not the Defendants, employed to transmit funds.  Indictment ¶ 13.

Judge Failla appeared to find that the Bank Secrecy Act, 31 U.S.C. § 5330(d)(1)(A) includes as a

definition of money transmission business not just the transmission and acceptance of funds, but

also *facilitating* transmission.  But that overlooks two things.

One, before a court should even consider whether an entity complied with the BSA, it must

first determine that the entity is a "money transmitting business" under Section 1960, and Section

1960 on its face does not criminalize facilitating transactions.  Rather, the statute defines money

transmitting as "transferring funds on behalf of the public by any and all means including but not

limited to transfers . . . by wire, check, draft, facsimile, or courier."  18 U.S.C. § 1960(b)(2).  If

Congress had wanted to define a money transmitting business as one that merely facilitates

someone else's transfer of funds, it would have said so.

Two, Judge Failla's interpretation of the Bank Secrecy Act was incorrect.  Judge Failla

referenced Section 5330(d)(1)(A), which defines a money transmission business as "any person

who engages as a business in an informal money transfer system or any network of people who

engage as a business in *facilitating* the transfer of money domestically or internationally outside

of the conventional financial institutions system."  Tr. at 22 (emphasis added).  But that overlooks

the remaining part of that provision, which makes clear that it applies only to "a business in the

*transmission* of currency, . . . *including* . . . any network of people who engage as a business in

facilitating the transfer of money domestically or internationally outside of the

conventional financial institutions system."   "Transmission of currency" is still necessary, 31

U.S.C. § 5330(d)(1)(A), and is absent here.

*Third*, with respect to the FinCEN 2019 Guidance, Judge Failla acknowledged that "it does

speak of control" of the cryptocurrency as a prerequisite to being a money transmitter, but found

24

that "[a]t its core, the Section 1960 offense seeks to prevent the unlicensed transmission of customer funds from one location to another, irrespective of whether the transmitter obtained temporary control over the funds to effectuate the transfer or constructed the transfers specifically in a matter to avoid such control."  Tr. at 22.  Judge Failla concluded that, regardless of whether the software took custody of the cryptocurrency, if it served the same purpose as "cryptocurrency mixing services recognized as money transmitting businesses," that was sufficient to require a license.  Tr. at 22.

Putting aside that "considerations of policy divorced from the statute's text" cannot carry the day, *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 317 (2011), that analysis is irrelevant to a CoinJoin.  FinCEN's guidance expressly distinguished between "anonymizing *services* providers"—so-called "mixers," where users transmit funds to a third party service that then retransmits them to help anonymize the transaction—with "anonymizing software providers," which are "suppliers of software a transmitt*or* [the cryptocurrency owner] would use for the same purpose."  2019 Guidance § 4.5.1 (emphasis in original).  An "anonymizing *software* provider is *not* a money transmitter."  2019 Guidance § 4.5.1(b) (emphasis added).  At bottom, Judge Failla made a policy determination that software that is "not meaningfully different" from custodial mixers should be treated like custodial mixers.  Tr. at 22.  But, as explained, Samourai Wallet is a CoinJoin, which is meaningfully different from a custodial mixer.[17]

## II.    THE SECTION 1956 COUNT FAILS AS A MATTER OF LAW

The indictment's remaining count asserts that the Defendants conspired with unidentified users of Samourai Wallet to commit money laundering in violation of 18 U.S.C. § 1956(h).

---

[17]  For additional criticisms of the *Tornado Cash* summary denial of the motion to dismiss, see Barabander et al., *supra*, at 23-32.

Indictment ¶¶ 29-30.  The object of the conspiracy was a purported agreement to violate Section 1956(a)(1)(B)(i), called "transaction" money laundering.  *Id.*

To state a cognizable count under these provisions, the government must plead and prove that a defendant "agreed to: (1) conduct a financial transaction; (2) involving the proceeds of specified unlawful activity; (3) knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity; and (4) knowing that the financial transaction was designed in whole or in part to conceal or disguise the nature, source, location, ownership, or control of those proceeds."  *United States v. Henry*, 325 F.3d 93, 103 (2d Cir. 2003).

Because a jury could not find the Defendants guilty on the facts alleged and conceded in the indictment, the Section 1956 count must be dismissed.

*First*, the indictment alleges that the Defendants violated Section 1956 by conducting a financial transaction by using a "financial institution" to conceal or disguise proceeds of specified unlawful activity.  Indictment ¶ 30.  While DOJ attempts to cast Samourai Wallet as a "financial institution" on the premise that it was a "money transmitter," that is wrong for the reasons discussed above.  For the same reason the unlicensed money transmitter count must be dismissed, the Court should dismiss the conspiracy to launder money count, as well.

*Second*, even if Samourai Wallet had been a financial institution, DOJ fails to allege a cognizable conspiracy.  DOJ's theory is that the Defendants knowingly and intentionally joined the conspiracies of unknown Samourai Wallet users simply because the Defendants allegedly knew generally that some customers could misuse the app to launder funds.  But under longstanding Supreme Court precedent, a business that sells a product or service to customers—even knowing that some of them will use the product unlawfully—does not thereby knowingly and intentionally agree to conspire with those customers.  This count thus fails as a matter of law.

### A.    Samourai Wallet Was Not a "Financial Institution"

The indictment charges that the Defendants conspired to conceal or disguise proceeds of specified unlawful activity "involv[ing] the use of a financial institution" in violation of 18 U.S.C. § 1956(a)(1)(B)(i).    Indictment ¶ 30.    But because Samourai Wallet was not a "financial institution," the count fails as a matter of law.

Section 1956(a)(1)(B)(i) prohibits "a financial transaction" conducted or attempted while "knowing that the property involved in [that] financial transaction represents the proceeds of some form of unlawful activity," and "knowing that the transaction is designed in whole or in part" to "conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds."    18 U.S.C. § 1956(a)(1)(B)(i).    As relevant here, the statute defines "financial transaction" as "a transaction involving the use of a *financial institution*."    18 U.S.C. § 1956(c)(4)(B) (emphasis added).    The indictment accordingly charges that the Defendants conspired to conceal or disguise proceeds of unlawful activity "involv[ing] the use of a *financial institution*."    Indictment ¶ 30 (emphasis added).    The statute defines "financial institution," as that term is "defined in [31 U.S.C. § 5312(a)(2)]," 18 U.S.C. § 1956(c)(6)(A).    As relevant here, that provision defines "financial institution" to include any business engaged "in the *transmission* of currency," 31 U.S.C. § 5312(a)(2)(R) (emphasis added)—*i.e.*, a money transmitter.

This is where the indictment goes off the rails.    The indictment presumes Samourai Wallet is a "financial institution" based on the DOJ's allegation that it is a "money transmitter."    As demonstrated, Samourai Wallet was not a money transmitter.    It follows that Samourai Wallet was not a financial institution, so the Section 1956 claim is legally defective.    *See* 31 U.S.C. § 5330(d)(1) (applying same definition to "money transmitting business"); *accord United States v.*

27

*Ness*, 565 F.3d 73, 79 (2d Cir. 2009) (rejecting government's theory that defendant was a money transmitter and holding, in turn, that defendant was not a "financial institution").

### B.    The Indictment Does Not Allege a Legally Cognizable Conspiracy

Even if Samourai Wallet had been a "financial institution" (it was not), the indictment's conspiracy to launder money allegations still fail as a matter of law.

### 1.    The Elements of a Cognizable Conspiracy

"Conspiring to launder money requires that [1] two or more people agree to violate the federal money laundering statute, and [2] that the defendant knowingly engaged in the conspiracy with the specific intent to commit the offenses that are the objects of the conspiracy." *United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009) (internal quotation marks omitted).

The government therefore must allege and prove that "the defendant *agreed* on the essential nature of the plan, and that there was a conspiracy to commit a *particular offense* and not merely a vague agreement to do something wrong." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (emphasis added) (citations omitted).  To establish the agreement requirement, there must be a "meeting of minds." *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977).  To establish the "knowingly" requirement, the government must allege and prove that "the person charged with the conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *Lorenzo*, 534 F.3d at 159.  The government must show "more than evidence of a general cognizance of criminal activity, suspicious circumstances, or mere association with others engaged in criminal activity." *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008).

Here, the indictment acknowledges that "Samourai [was] used by customers all over the world," Indictment ¶ 9, and purportedly "enabled Samourai *users* to launder criminal proceeds." *Id.* at ¶ 27 (emphasis added).  But the indictment does not identify any meeting of the minds

28

between the Defendants and any customer to agree to join any customer's conspiracy. Nor does the indictment allege that the Defendants knew the purpose of any given transaction, much less that they knew of particular instances of misuse of the app by any customer or that Samourai Wallet transactions by users involved the proceeds of a crime. Instead, the indictment merely identifies purported transactions by users who possessed funds that DOJ claims were from suspect sources; it fails to alleges that the Defendants knew of these transactions or the reason for the transactions. *Id.* ¶ 28.

Rather, the indictment invites an unsupported inference of an agreement and knowledge and intent to join a conspiracy with unknown customers based solely on the allegations that (a) some funds held by customers who used the app purportedly derived from suspect sources on the web, Indictment ¶ 28; (b) the Defendants purportedly knew generally that some customers would misuse the app, *id.* ¶¶ 19, 21; and (c) the company supposedly "marketed" the product for such misuse through social media posts. *Id.* ¶¶ 16, 18. Even if these allegations were true (they are not), the indictment fails to state a cognizable conspiracy as a matter of law.

**2.    The Indictment Fails to Allege That the Defendants Had Knowledge of Any Conspiracy By Customers to Misuse Samourai Wallet**

More than eighty years ago, Judge Learned Hand decried the government's propensity to overreach with claims of conspiracy: "[S]o many prosecutors seek to sweep within the drag-net of conspiracy all those who have been associated in any degree whatever with the main offenders. That there are opportunities of great oppression in such a doctrine is very plain, and it is only by circumscribing the scope of such all comprehensive indictments that they can be avoided." *United States v. Falcone,* 109 F.2d 579, 581 (2d Cir. 1940). That warning rings particularly true here,

given that Judge Hand was writing for a court reversing a conspiracy conviction based on the very theory the DOJ is now pursuing against the Defendants.

In *Falcone*, suppliers of sugar and yeast sold the products to bootleggers knowing the products would be used to make illicit alcohol. *Id.* The government charged them all with a conspiracy to make illicit alcohol. *Id.* Reversing the suppliers' convictions, Judge Hand flatly rejected the theory that a person who sells a product "becomes a conspirator with—or, what is in substance the same thing, an abettor of—the buyer because he knows that the buyer means to use the goods to commit a crime." *Id.* at 581.

In a landmark decision, the Supreme Court affirmed. *United States v. Falcone*, 311 U.S. 205 (1940). The Court held that knowledge a customer will use a product for criminal acts is insufficient to infer knowledge of the customer's conspiracy. *Id.* at 210. Although the indictment "did allege that [the suppliers] sold the materials mentioned knowing that they were to be used in illicit distilling" and "charg[ed] generally that all the defendants were parties to the conspiracy," it "did not allege specifically that any of [the suppliers] had knowledge of the conspiracy." *Id.* at 207-08. "[O]ne who without more furnishes supplies to an illicit distiller is not guilty of conspiracy even though his sale may have furthered the object of a conspiracy to which the distiller was a party but of which the supplier had no knowledge." *Id.* at 211; *accord Direct Sales Co. v. United States*, 319 U.S. 703, 709 (1943) ("[O]ne does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally.").

Applying *Falcone*, courts repeatedly have dismissed indictments or reversed convictions for conspiracy where the government engaged in similar overreach. In *United States v. Superior*

30

*Growers Supply, Inc.*, 982 F.2d 173 (6th Cir. 1993), for instance, the government charged a garden supply store and its owners and employees with conspiracy to aid the illegal manufacture of marijuana. The government alleged that the defendants sold gardening equipment and supplies knowing that purchasers would use the materials to cultivate the drug. *Id.* at 175. The defendants "advertise[d] their products in 'High Times' magazine and other marijuana-related publications," "[sold] or [gave] publications concerning the growing of marijuana and other marijuana-related publications to many of their customers," and "provide[d] information and advice on the growing of marijuana to various customers." *Id.* The Sixth Circuit nevertheless affirmed dismissal of the indictment as a matter of law. The court held that merely providing gardening products to customers, even advertising them as tools to illegally grow marijuana, was insufficient to establish knowledge of any *specific* conspiracy. *Id.* at 178. Put simply, "there is a gulf between knowledge and conspiracy." *United States v. Blankenship*, 970 F.2d 283, 289 (7th Cir. 1992) (applying *Falcone*).

Here, the gulf is even greater, mandating dismissal of the conspiracy charge. The indictment does not allege that the Defendants knew of any particular criminal conspiracies to launder money. Not a single one. Rather, the indictment alleges only that they had general awareness that some unidentified customers could use the app to hide illicit funds, Indictment ¶ 27, and "marketed" the app for such purposes on social media, *id.* ¶¶ 27-28.[18] But there is no allegation that either Defendant knew or suspected that any particular transaction involved the proceeds of

---

[18]   The indictment completely missed the tongue-in-cheek, attention-seeking nature of social media. In any event, accepting the indictment's allegations as true (as required here), none of the alleged social media "marketing" of the app in the indictment establishes the knowledge and intent necessary to join any conspiracy to commit money laundering.

crime, much less the purpose of the transaction by one of Samourai's thousands of anonymous users.

Developing a software platform allegedly knowing that some customers may misuse it to commit a crime is not materially different from providing sugar and yeast to customers knowing they may make illegal alcohol, or selling gardening supplies to customers knowing of, and even promoting, their use to cultivate marijuana. Yet here, that is the alleged basis for the purported conspiracy.

### 3. The Indictment Fails to Allege That the Defendants Had a Meeting of the Minds and Agreed to Join Any Customers' Conspiracy

Even if a defendant knows about a particular conspiracy, merely providing goods or services that aid the conspiracy is not enough to establish an *agreement* with the customers and *intent* to join the conspiracy. "It is not enough that a defendant may have wittingly aided a criminal act or that he may have intended to do so in the future; to convict a defendant of conspiracy the government must demonstrate that the defendant agreed with others that together they would accomplish the unlawful object of the conspiracy." *United States v. Alvarez*, 610 F.2d 1250, 1255 (5th Cir. 1980). And "even if a conspiracy between two parties is established, not every act of a third person that assists in the accomplishment of the objective of the conspiracy is a sufficient basis to demonstrate his concurrence in that agreement." *Id.* at 1256.

As Judge Easterbrook explained in *Blankenship*, merely "providing assistance to a criminal organization" is not "the same thing as conspiracy." 970 F.2d at 285. Rather, "there is a difference between supplying goods to a syndicate and joining it, just as there is a difference between selling goods and being an employee of the buyer." *Id.* The court in *Blankenship* reasoned: "Cargill sells malt and barley to Anheuser Busch, knowing that they will be made into beer, without being part

of Busch; by parallel reasoning, someone who sells sugar to a bootlegger knowing the use that will be made of that staple is not thereby a conspirator . . . ." *Id.* "'[M]ere sellers and buyers are not automatically conspirators. If it were otherwise, companies that sold cellular phones to teenage punks who have no use for them other than to set up drug deals would be in trouble, and many legitimate businesses would be required to monitor their customers' activities." *Id.*

The indictment fails for similar reasons here. Allegedly knowing or marketing the misuse of a product is, as a matter of law, different from *agreeing* with customers and *intending to join* their broader conspiracy. Providing software allegedly knowing it will be misused by some customers to mask the proceeds of their alleged illicit activities is materially indistinguishable from selling cell phones knowing some users may use them to facilitate illegal drug sales. *Blankenship*, 970 F.2d at 285. The government's interpretation here would eviscerate the "agreement" requirement, "thus eliminating a significant limiting principle" aimed at preventing boundless secondary liability. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 490 (2023). And it would eliminate the prerequisite that a conspiracy requires "mutual dependence and assistance" with the perpetrators of the underlying criminal acts. *E.g.*, *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990).

At bottom, DOJ's charge isn't that the Defendants knowingly and intentionally agreed with anyone to commit a crime, but that they knew generally that some people could use the app to commit crimes and that they did not employ various AML programs and procedures to stop it. Indictment ¶ 27. Even if that were true, that is at most negligence, not intentional wrongdoing, much less criminal conduct. And as the Supreme Court recently reaffirmed in rejecting claims against social media platforms alleging that they knowingly allowed terrorists to use their platforms to fundraise and facilitate terrorism, "our legal system generally does not impose liability

33

for mere omissions, inactions, or nonfeasance." *Twitter, Inc.*, 598 U.S. at 489.  In all events, the indictment here is legally defective, unfair, and should be dismissed in its entirety.

## CONCLUSION

For all the reasons above, the Court should dismiss the indictment against Mr. Rodriguez and Mr. Hill.


Dated:  May 29, 2025                                    Respectfully submitted,

*/s/ Roger A. Burlingame*                               */s/ Michael Kim Krouse*
Roger A. Burlingame                                     Michael Kim Krouse
Matthew L. Mazur                                        William T. Sharon
DECHERT LLP                                             Maya Kouassi
Three Bryant Park                                       ARNOLD & PORTER
1095 Avenue of the Americas                                KAYE SCHOLER LLP
New York, NY 10036                                      250 West 55th Street
(212) 698-3500                                          New York, NY 10019-9710
roger.burlingame@dechert.com                            (212) 836-8000
matthew.mazur@dechert.com                               michael.Krouse@arnoldporter.com

*Counsel for Defendant William*                         Anthony J. Franze (*pro hac vice* pending)
  *Lonergan Hill*                                        ARNOLD & PORTER
                                                           KAYE SCHOLER LLP
                                                        601 Massachusetts Avenue, NW
                                                        Washington, DC 20004
                                                        (202) 943-6479
                                                        anthony.franze@arnoldporter.com

                                                        *Counsel for Defendant Keonne Rodriguez*

34