Exhibit A

P5UVSTOC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        23 Cr. 430 (KPF)

5   ROMAN STORM,

6              Defendant.               Teleconference

7   ------------------------------x

8                                       New York, N.Y.
                                        May 30, 2025
9                                       11:10 a.m.

10
    Before:
11
                   HON. KATHERINE POLK FAILLA,
12
                                        District Judge
13

14                       APPEARANCES

15
    JAY CLAYTON
16       United States Attorney for the
         Southern District of New York
17  NATHAN M. REHN
    BEN ARAD - DOJ
18  BENJAMIN A. GIANFORTI
    KEVIN G. MOSLEY
19       Assistant United States Attorneys

20  WAYMAKER LLP
         Attorneys for Defendant
21  BRIAN E. KLEIN
    KEVIN M. CASEY
22  VIVIANA ANDAZOLA MARQUEZ
    KERI C. AXEL
23       -and-
    HECKER FINK LLP
24  DAVID E. PATTON
    NICHOLAS D. PAVLIS

25

P5UVSTOC

1             (Teleconference)

2             (Case called)

3             THE DEPUTY CLERK:  Counsel, please state your name for

4       the record, beginning with the government.

5             MR. REHN:  Good morning, your Honor.

6             This is Thane Rehn, appearing for the United States.

7             We also have on the line Ben Arad, Ben Gianforti, and

8       Kevin Mosley.

9             MR. KLEIN:  Good morning, your Honor.

10            This is Brian Klein, for Mr. Storm.

11            You have Keri Axel, Viviana Andazola Marquez, David

12      Patton, Nick Pavlis, Kevin Casey, and you also have our client

13      who's on by telephone.

14            THE DEFENDANT:  This is Roman Storm, your Honor.

15            (Pause)

16            THE DEPUTY CLERK:  Counsel, hold on one second.  I

17      believe there's some audio issues with the judge's line.

18            (Pause)

19            THE COURT:  Counsel, I am trying again.

20            This is Judge Failla.  I heard everything that you

21      said.  I didn't think you could hear me.

22            Ms. Noriega, can you hear me?

23            THE DEPUTY CLERK:  Yes, Judge, I hear you now.

24            THE COURT:  Then we are progressing.

25            So thank you to everyone.  I won't ask you to

P5UVSTOC

 1  introduce yourselves.  Much appreciated.

 2            And Mr. Storm, I heard you as well.

 3            Mr. Klein, do I understand that you are waiving the

 4  ability to have this conference in person today?

 5            MR. KLEIN:  Yes, that's right, your Honor.

 6            THE COURT:  Thank you.

 7            And may I confirm that with your client please.

 8            MR. KLEIN:  Yes, you may, your Honor.

 9            THE COURT:  Okay.  Mr. Storm, this is Judge Failla.

10            I'm understanding that it is your wish to proceed

11  today by Teams, even though you could and do have the right to

12  have this conference take place in person; is that correct,

13  sir?

14            THE DEFENDANT:  Yes, it is correct, your Honor.

15            THE COURT:  Okay.  Thank you.

16            And good morning to you.

17            Mr. Rehn, I understand that you are the person to whom

18  I can be directing my questions with respect to the government,

19  and so I would like to do that.

20            Mr. Klein, it's my understanding, sir, the parties

21  haven't reached a complete agreement that would obviate the

22  need for this call; correct?

23            MR. KLEIN:  That's right, your Honor.

24            THE COURT:  Okay.  Then let me ask some questions

25  then.

P5UVSTOC

1          Please note that I have reviewed the letters that

2   you've submitted to me which include a letter from the defense

3   of May 16th, which includes, among its many exhibits, a letter

4   from the government to the defense dated May 12th, a responsive

5   letter from the government dated May 21st, and then a reply

6   from the defense dated May 21st.

7          I've also done a shallow dive into the *Rodriguez* case

8   before Judge Berman that is mentioned.  In particular, I was

9   looking at some submissions filed yesterday and overnight just

10  to get a sense of what is going on there.

11         So, Mr. Rehn, with that in mind, I would like to ask

12  you some questions about the timeline.  If you believe it is

13  inappropriate for me to ask those questions, you'll let me know

14  after I've asked them.  All right, sir?

15         MR. REHN:  Yes, your Honor.

16         THE COURT:  Thank you.

17         Mr. Rehn, my sense is that there are no common AUSAs

18  between Team Rodriguez and Team Storm; am I correct?

19         MR. REHN:  That is correct at the line level, your

20  Honor.  But the cases are both supervised by at least one

21  overlapping supervisor.

22         THE COURT:  Okay.  Was that overlapping supervisor

23  present for the calls that are at issue today?

24         MR. REHN:  If you're referring to the call between the

25  line AUSAs and FinCEN, she was not on that call.

P5UVSTOC

| 1 | THE COURT:  Okay.  Let me ask the questions a little |

1       THE COURT:  Okay.  Let me ask the questions a little

2   bit differently please.

3       My understanding from the *Rodriguez* case was that the

4   call that is at issue there took place on August 23rd of 2023.

5   Your letter to me refers to a call that took place in August of

6   2023.  Was that call -- was your call with FinCEN on the same

7   day as the *Rodriguez* team's call with FinCEN?

8       MR. REHN:  No, it was prior to that, I believe.

9       THE COURT:  All right.  There's also a reference, sir,

10  to a May call -- excuse me.  Let me be more precise.

11      In one of the recent *Rodriguez* submissions, there's a

12  reference to a sort of preparatory call in May.  Were you

13  involved in any respect with that call, sir?

14      MR. REHN:  No.

15      THE COURT:  Okay.  Did your call with FinCEN — was it

16  a single call or several?

17      MR. REHN:  As far as I recollect — I would have to go

18  back and confirm this — there was only one call between the

19  Tornado Cash team and FinCEN.  And I believe it was on

20  August 16th, 2023.

21      THE COURT:  August 18th of 2023.  Thank you, sir.

22      MR. REHN:  16th.

23      THE COURT:  Excuse me, sir?

24      MR. REHN:  I believe it was August 16th.

25      THE COURT:  Excuse me.  Okay.  I should take better

1    notes.  Thank you.

2                Was it with the same people at FinCEN, sir?

3                MR. REHN:  I don't believe it was exactly the same

4    people, but I believe there may have been overlap.  I'm not

5    sure if we actually have notes of who was on the call on the

6    FinCEN side.  We can check that.

7                THE COURT:  Okay.  You make a point in your submission

8    to me of saying that you did not in that call seek to obtain

9    the views of the individual -- the individuals in that call or

10   participating in that call regarding their views about either

11   the charges that you had brought or the interpretation of any

12   regulation.  Am I correct?

13               MR. REHN:  That is correct.

14               THE COURT:  Was that a conscious decision, sir, or

15   simply the view that what these folks said didn't matter?

16               MR. REHN:  I don't think it was a conscious decision.

17   That wasn't, sort of, particularly relevant, in our view, in

18   terms of interpreting the statute or the regulation what some

19   people -- you know, employees we happened to be talking to at

20   FinCEN's view on it were.  So it wasn't something we thought to

21   ask.

22               THE COURT:  Okay.  And I don't mean to sound like the

23   village idiot here, but given that the call that is the subject

24   of the *Rodriguez* case took place a week after your call, it's

25   pretty safe to say you weren't aware of what was going to be

P5UVSTOC

1  discussed on the August 23rd call or what had been discussed on

2  the August 23rd call, not being psychic and all.

3       MR. REHN:  That is correct.  We didn't know that call

4  took place and didn't -- were not aware of it.

5       THE COURT:  Sir, you've made a point of saying that

6  there are differences between the Samourai entity or protocols

7  and Tornado Cash.  But the defense's point is that as they

8  understand the phone calls, the discussion of custody was a

9  point that was of some import in both cases.  Could you respond

10  to that please?

11       MR. REHN:  So we don't have more insight into, sort

12  of, the specifics of the call than what's in the notes that

13  have been publicly filed in the *Samourai* case.  And so, you

14  know, the notes reflect discussion by the FinCEN employees of a

15  view that they apparently expressed, that custody was a factor

16  that FinCEN took into account in its guidance.

17       I don't know the degree to which there was more

18  nuanced factual discussion of that issue.  But we do agree —

19  and obviously have briefed in this case — that the Tornado Cash

20  service, also like the Samourai service, as I understand it —

21  without speaking to the proof in that case — neither service

22  has what is eventually referred to as custody in the crypto

23  space of the cryptocurrency.

24       THE COURT:  Okay.  One moment please.

25       At your letter to me or your colleague's letter to me

P5UVSTOC

1    of May 21st, in your footnote 2, you make a point of saying

2    that -- am I correct you no longer intend to call a witness

3    from FinCEN; is that correct?

4              MR. REHN:  That's correct.

5              THE COURT:  And that's why the government is also

6    abandoning those theories of criminal liability that might --

7    that have some relationship with or might depend on the

8    interpretation of Section 5330; is that also correct?

9              MR. REHN:  That's correct, your Honor.

10             The only way that the BSA, as set forth in Section

11   5330 of Title 31 and the accompanying regulations, would come

12   into play would be if there was question at trial under

13   (b)(1)(B), which is the only section of 1960 that references

14   that separate statutory regime.  So it's our view that there

15   really won't be any references to that separate statutory

16   regime or the accompanying regulations at trial.

17             THE COURT:  And then just to put a finer point on it,

18   from your team's perspective, you have no present intention of

19   mentioning the words "FinCEN" or "5330" at trial.

20             MR. REHN:  That's correct.

21             THE COURT:  Now, sir, you say on the first paragraph

22   of your responsive submission of May 21st:  As the government

23   has already explained to the defense, there are no similar

24   materials in this case.

25             I guess I'd like to know what that means.  And let me

P5UVSTOC

1    be more precise about what I'm asking, sir.

2               I don't know whether you are saying, We have no *Brady*;

3    we've complied with our *Brady* obligations; this isn't *Brady*;

4    this isn't *Giglio*; this isn't Rule 16, but there's other stuff

5    out there.

6               Or are you saying, There are no other calls with

7    FinCEN and, therefore, no other notes of other calls with

8    FinCEN; and no discussions with them about the importance or

9    not of custody, or something else?  Do you see what I'm saying,

10    sir?  I don't know what you mean, and I want you to be very

11    precise about what you mean, whether there's nothing there or

12    there's nothing there that you believe to be responsive.

13               MR. REHN:  So there are no materials in our possession

14    in which we have any indication of FinCEN's view of the Tornado

15    Cash service and whether it complies with FinCEN's regulations,

16    whether it was required to register, whether -- the application

17    of any either regulation, regulatory guidance, or statute to

18    the Tornado Cash service.  We never sought any such views; we

19    never obtained any such views, whether orally, in writing, or

20    otherwise.

21               And so when we say "similar," we mean there was no

22    similar effort by our team to obtain views of anybody on the

23    FinCEN side regarding issues relating to their view of whether

24    the Tornado Cash service had any regulatory obligations under

25    the FinCEN regulatory regime.

P5UVSTOC

1          THE COURT:  I understand.  I'm going to -- I'll come

2     back to you in a little bit.

3          I would like to speak to Mr. Klein now, thank you.

4          Mr. Klein, your initial request to me of May 16th

5     asked for several things; and you asked for several things as

6     well of the government.  And one of them was a bit of a

7     timeline, which I was interested in as well, and I believe I've

8     satisfied myself of that, the timing of certain events.

9          I would like, therefore, to understand, sir, what it

10    is you believe you still need and why, after reading the

11    government's responses and after hearing my discussions with

12    Mr. Rehn this morning.

13         MR. KLEIN:  Yes, your Honor.  A couple things.

14         One is the attached -- there was an email from AUSA

15    Chan to the supervisors that disclosed this information.  And I

16    believe you asked a question about whether there were

17    overlapping supervisors.  And there are a number of supervisors

18    listed on that email; it's attached as an exhibit to our

19    initial *Brady* letter.

20         And I don't know which supervisor Mr. Rehn is

21    referring to, but there are a number of them there.  And so I

22    would ask you to ask if the email that was sent to the

23    supervisors includes a supervisor that is supervising the *Storm*

24    prosecution, that's my first question.

25         THE COURT:  All right.

P5UVSTOC

1          MR. KLEIN:  That is exhibit -- and I'll tell you the

2     exhibit number, your Honor.  It's Exhibit A to our May 16th

3     letter, docket 148.

4          THE COURT:  Yes, I'm looking at it now, sir.  Thank

5     you.

6          I'm sorry, whom do you believe to be the supervisors

7     on this email, sir?

8          MR. KLEIN:  Well, the email from AUSA Chan says:  Hi

9     CFU and MLOC chiefs.  So I believe that's addressed to the

10    chiefs of those sections at the U.S. Attorney's Office.

11         THE COURT:  I see.

12         MR. KLEIN:  And those individuals may be also -- one

13    of them, at least, may be also supervising the *Storm* case.

14         THE COURT:  I see.

15         All right.  I'll ask — I'm not sure about the

16    necessary relevance — but, Mr. Rehn, are any of the individuals

17    who are the addressees of Mr. Chan's email supervising the

18    *Storm* case?

19         MR. REHN:  Yes, your Honor.  Tara La Morte is one of

20    the chiefs of the money laundering unit, and she has supervised

21    both cases.  She obviously was made aware of these notes of the

22    Samourai call on August 23rd, when she received this email.

23         So I think under the law, that knowledge would

24    probably be imputed to us as the prosecution team.  I don't

25    think we would deny that.  But that was never communicated to

P5UVSTOC

1    the prosecutors on this call until much more recently.  But we

2    don't deny that the overlapping chief was aware of the issue.

3              THE COURT:  Okay.  Thank you.

4              Mr. Klein.

5              MR. KLEIN:  I guess our other question was when did

6    they learn -- individually.  I understand their chief did, so

7    it's imputed to them, and I agree with that.  But it's still

8    unclear when the actual AUSAs on this call learned about the

9    Samourai -- I'll call the Samourai disclosure.

10             THE COURT:  Mr. Rehn?

11             MR. REHN:  We can actually be pretty precise on this

12   one because we got forwarded a letter after the Deputy Attorney

13   General's memo came out on April 7th.  Shortly after that, both

14   the *Tornado Cash* defense team and the *Samourai* defense team

15   submitted letters to our office.  And we were forwarded that

16   letter on April 10th from the *Samourai* prosecutors.  And that

17   letter from the *Samourai* defense team mentioned this

18   disclosure, and so that was the first time we became aware of

19   it, on April 10th of this year.

20             THE COURT:  All right.  Mr. Klein, let's move on.

21             MR. KLEIN:  Yes, your Honor.

22             So those were my two questions.  I think it is highly

23   relevant that their supervisor was aware of this back in

24   August 2023.

25             THE COURT:  Why is that?  I guess one of the things --

P5UVSTOC

1    there are certain arguments that you're making, sir, and I do

2    appreciate them.  In terms of whether this is *Brady* or not,

3    it's not clear to me that it is.

4            I think the argument that had a little bit more

5    traction from your perspective was this argument that you

6    believe I may have been misled at the time of the motion to

7    compel the motion to dismiss, because they were making

8    arguments about FinCEN's policy or FinCEN's views that you

9    believe were undermined by the folks with whom they were

10   speaking.  Am I understanding that argument correctly?

11           MR. KLEIN:  Yes, your Honor, that was one of our

12   arguments.

13           THE COURT:  All right.  But the fact is, I mean, I

14   see -- I have read the notes.  Obviously the notes --

15   Mr. Chan's email is quite redacted, so I read what has not been

16   redacted.  It doesn't change the decision that I've made.  I

17   don't believe that it would have been relevant to my decision

18   that there were people within FinCEN who had a different order

19   of priorities regarding the importance or the primacy of

20   custody.

21           So from my perspective, if this prosecution team had

22   known that there were people at FinCEN — I know you believe

23   that there are very senior people at FinCEN, and I understand,

24   but I don't yet hear them -- they're not necessarily -- they

25   weren't speaking for FinCEN, as much as speaking as

P5UVSTOC

1    representatives of; and I don't think they were making policy

2    in that phone call.

3         But I don't think that it was *Brady*; I think it's

4    something I might have liked to know.  But now that I know it,

5    I mean, I had no present intention of changing my decision.  So

6    I don't really -- I guess a lot of your current arguments to me

7    about why it remains relevant to the remaining charges of this

8    case again proceed from the premise that somehow I believe

9    there's an overlap or there should be an overlap between the

10   1960 offense -- Section 1960 and Section 5330.  I think of them

11   as different things.  I said that in my oral decision, I still

12   believe it.

13        So given that, I don't see the relevance and I don't

14   see that it is *Brady*.  But I'll hear from you as to why I'm

15   wrong.

16        MR. KLEIN:  Your Honor, a couple things.

17        I mean, I do think, again, it's important that their

18   supervisor know — who probably had some input on their motions

19   and the arguments they were formulating.  So, again, I don't

20   know -- peek behind that wall there, but I think, again, that

21   is a really important point.

22        And as your Honor noted, these aren't -- they are not

23   just employees, these are senior people who were consulted by

24   AUSAs in a very similar case in many respects about a key issue

25   in our case that is a major issue of contention legally and

P5UVSTOC

1   factually.  Obviously we would have loved to have known about

2   this.  And they were planning on call a FinCEN witness until

3   just like they filed their letter and they knew about this

4   before that, back in at least -- as they are saying, back in

5   April of this year.

6           So I think this is all highly relevant to the types of

7   motions we were filing, the arguments we would have made.  I

8   know we can't unwind time and go back there, but, you know, we

9   would have definitely raised this issue, and I would hope we

10  might have been able to persuade you on it.  And definitely

11  would have wanted to probe on this further.

12          In addition, they were planning on calling a FinCEN

13  witness.  We've been preparing for trial.  We thought we were

14  going to trial back in April.  And this was in the possession

15  of the prosecution team in this case, since their supervisor

16  had it.  So I think that's all highly relevant to us.

17          It also goes to what we view as a factual dispute

18  here, which is the reasonableness of our client's good-faith

19  belief that what he was doing was lawful, and that is

20  definitely a contention here.  And here you've got senior

21  people at FinCEN taking a view consistent with the one our

22  client took, consistent with the view of lawyers who wrote

23  memos.  And this is a public memo; this is not a memo that's

24  covered by the attorney-client privilege.  It's a memo from one

25  of the investors that was provided the -- you know, is not

P5UVSTOC

1    waiving privilege by discussing that memo.

2            So we just view this incredibly relevant to the

3    defenses we were going to raise until a week ago or when they

4    filed was going to be relevant to our cross-examination.  And

5    we also still think it's relevant to the charge that they are

6    pursuing under 1960.  I mean, they still plan to say it's an

7    unlicensed money transmitting business.  That's the core of the

8    subpart B; that's what they are alleging.  Even if they are not

9    going to call someone from FinCEN, they are still putting that

10   at play.  And here you've got people, senior people at the

11   organization, saying, you know, that's not the case if you

12   don't have custody, essentially.

13           THE COURT:  All right.  But let me just unpack what

14   you've said.

15           Once again, there is a difference between you and I

16   might have liked to have known, and there is a *Brady* violation.

17   You haven't persuaded me — and even with the disclosure of this

18   memo, you haven't persuaded me — that the custody issue is as

19   important as you state or that 1960 and 5330 are coextensive.

20   So on that point, I mean, yeah, you could have made arguments,

21   but you haven't -- I mean, even as you're trying to make them

22   to me now, they are not working.  Maybe try them again, but I

23   have what I have.

24           On the issue of -- I mean, but I guess more broadly,

25   sir, you kind of won in the sense that the government dropped

P5UVSTOC

1    those charges and those theories.  And I completely understand

2    and respect if your view is, Yeah, but we've been preparing for

3    them and we wouldn't have.  Same here.  I wouldn't have either.

4    But you've won in the sense that those charges are no longer

5    being pursued.

6           On the issue of the factual dispute of the

7    reasonableness of your client's views, I don't know that the

8    views of two senior people at FinCEN as to charges that no

9    longer involve 5330 matter.  I don't think, for example, if you

10   called them as witnesses, I don't think I'd let you talk about

11   their private ruminations when they haven't yet made it into

12   FinCEN guidance, and when they make a point of saying — at

13   least as relayed by Mr. Chan — that they did not have a sense

14   of what FinCEN would decide if this question were presented to

15   their FinCEN policy committee.

16          So I'm annoyed, like you're annoyed; but I don't know

17   what you want me to do.  I got the timeline for you.  At the

18   moment, I'm not changing my decision.  We know better what the

19   charges are, although I'm telling the government now, you can't

20   keep changing things.  So if there's going to be more changes

21   to the theories -- or to the charges that you're pursuing, you

22   really do have to let me know and let the defense know now;

23   because at this point, it will very soon be unfair.

24          But, Mr. Klein, what else do you want?

25          MR. KLEIN:  Your Honor, I do appreciate your inquiry

P5UVSTOC

1    on the timeline.  I just want to be very clear.  And that it

2    was helpful to us, and we will want to think about that more.

3            But, you know, they do plan to still say they're

4    charging the conspiracy to operate an unlicensed money

5    transmitting business.  That's what they plan to say.

6            THE COURT:  Yes.

7            MR. KLEIN:  It's going to be in their jury

8    instructions.

9            Well, the question is who are they supposed to be

10   licensed with?  And if it's an unlicensed money transmitting

11   business, what these people at FinCEN are talking about is what

12   would require you to get a license if you're a money

13   transmitting business, right?  So this is all in the same

14   issue.

15           They've only dropped one subpart of 1960.  But they're

16   still going to get up and say it was an unlicensed money

17   transmitting business.  And that begs all these questions and

18   puts all this at the forefront of the jury.  And so this is

19   still a very live issue here, even though they are not

20   proceeding with B, and apparently don't plan to call a FinCEN

21   person and reference FinCEN.  But they are basically making all

22   of the same arguments.

23           THE COURT:  But my recollection, sir — and what I'm

24   remembering from my decision — is that 1960 had its own set of

25   definitions, does it not?

P5UVSTOC

1          MR. KLEIN:  It does have definitions, your Honor, yes.

2          THE COURT:  All right.  And that's what I was -- and

3     that was why I was less -- that's why I was less receptive to

4     your argument about the significance or not of 5330 to that

5     issue, because 1960 had its own definitions.  So I guess on

6     that front I just disagree with you that this is exculpatory or

7     impeachment.

8          Again, I don't think the views of FinCEN employees —

9     even senior FinCEN employees that don't make its way into

10    FinCEN policy — matter.  And with respect to the issue of your

11    client's -- the reasonableness or not of his views, if he's not

12    aware of these employees' views, I'm not sure how they would

13    be -- how they'd be relevant either.  So I guess we are where

14    we are.

15         I'm hearing you, sir, and I fully -- I'm not stupid

16    enough to think that you're not going to try and move for me to

17    reconsider the prior reconsideration motion of my motion to

18    dismiss; I'll just wait for that to come in.  But at the

19    moment, I don't see -- I don't see that there's anything more

20    for me to do.

21         Before I conclude that definitively, though, Mr. Rehn,

22    why isn't the defense correct that this information goes still

23    to the issue of the money transmitting business, apart from

24    what I've said?

25         MR. REHN:  Yes, your Honor.

P5UVSTOC

1            It's just a misreading of the statute on the defense

2     side.  Yes, the title of the statute is "Unlicensed Money

3     Transmitting Business."  But the theory that is going forward

4     is violation of (b)(1)(C), which defines an unlicensed money

5     transmitting business to be any business involving the

6     transportation or transmission of funds that are known to have

7     been derived from a criminal offense.

8            So essentially it's sort of like a -- the word

9     "license" doesn't apply here.  There is no available license to

10    move criminal proceeds.  And the jury won't be instructed that

11    there's any licensing issue at play at the trial.

12           And like I said, we don't intend to discuss licensing

13    or registration or regulatory requirements in any way.  What we

14    intend to prove at trial is the defendant knew his business was

15    transmitting funds that were derived from a criminal offense.

16           THE COURT:  All right.  Mr. Rehn, you heard my broader

17    point, and maybe I'll say it again with the diplomacy for which

18    I am known.

19           I don't like the fact that in a case that's several

20    years old, we're changing theories or dropping theories so

21    close to trial.  I believe I understand you to be saying that

22    everybody in your office who needed to reach out with whomever

23    in the DAG's office about how this case should continue and

24    what charges should be brought, that, from your perspective,

25    sir, those discussions are finally concluded?

P5UVSTOC

1                MR. REHN:  Yes, your Honor.

2                And, you know, we obviously did not anticipate that

3        the Department of Justice would issue new guidance for

4        prosecutors' offices in April of this year, shortly before our

5        trial date.  Once that guidance was issued, the defense

6        initiated conversations with our office and ultimately with the

7        Deputy Attorney General's office.

8                We've had those conversations here.  We've had those

9        conversations with the Deputy Attorney General's office.  And

10       we filed a letter explaining that the result of those

11       conversations was to proceed on the charges that we've

12       identified as going forward.  And so as far as we know, there's

13       no further changes coming; and those changes were motivated in

14       large part by a request from the defense that were made after

15       the Deputy Attorney General's memo came out.

16               THE COURT:  Again, Mr. Rehn, you'll tell me if this is

17       a question I cannot ask.  But it sounded to me like dropping

18       the charges that related to 5330, I thought it was a product of

19       information such as Mr. Chan's memo.  It's not?  It's a product

20       of Mr. Blanche's memo?

21               MR. REHN:  That's correct.

22               I can't get into too much more detail than to say that

23       after the Deputy Attorney General's memo came out, the defense

24       initiated a request.  And there was discussion both at our

25       office and with the Deputy Attorney General, and extensive

P5UVSTOC

 1     discussions with the defense.  And the result of those

 2     discussions was, as we filed in our public letter, to not

 3     proceed to trial on the (b)(1)(B) count.

 4               THE COURT:  All right.  So, again, Mr. Rehn, to put a

 5     finer point on it, it is your prosecution team's present intent

 6     to proceed in the manner that you've described to me with no

 7     further changes.

 8               MR. REHN:  Yes, your Honor.

 9               THE COURT:  All right.

10               Mr. Klein, I thought I understood from your submission

11     that you were still trying to get an audience with the Deputy

12     Attorney General, or perhaps I've misunderstood that.

13               MR. KLEIN:  Your Honor, we are going to continue to

14     advocate — whether in front of the U.S. Attorney's Office or

15     the Main Justice — that this case be dismissed, just as we're

16     going to continue to advocate in front of your Honor to dismiss

17     this case.

18               THE COURT:  Okay.  All right.  I'm aware of that.

19               I will be looking at -- I'm sure there are more

20     submissions coming.  I already know we have a timeline for the

21     pretrial submissions.

22               I have resolved the *Brady* inquiry.  As I've resolved

23     it, I've asked for some information about the timeline.  I've

24     asked for information which has been provided to me.  I'm not

25     going to require a further review based on the representations

P5UVSTOC

1   made that there's no additional material of this type, and

2   based on my views that I don't believe the material that was

3   produced was exculpatory or impeachment under the claims that

4   now exist.

5           That said, I am reminding the government that

6   disclosure issues are something that concern me greatly these

7   days, and I don't want to have any.

8           With that, I'm letting you all go.

9           We have a schedule in place.  Is there anything -- I

10  guess from my perspective, there's nothing else to address.

11  But, Mr. Klein, do you think otherwise?

12          MR. KLEIN:  Your Honor, you're a mind reader, yeah.

13          We conferred with the government yesterday.  We have a

14  proposal for your Honor just to move a few dates just slightly.

15          So, at present, motions *in limine*, voir dire, jury

16  instructions, *Daubert* motions are due June 4th.  Due to some

17  scheduling issues and working through some of the issues even

18  raised today, we'd ask for just a very brief extension of that

19  deadline to Friday, June 6.

20          And then we'd ask for the corresponding movement of

21  the opposition date, which is presently June 13th, which is a

22  Friday, to Monday, June 16th.  So just a few extra days for us

23  to deal with some scheduling issues that have come up, but also

24  to you know calibrate this discussion hearing to what we're

25  doing.

P5UVSTOC

1                THE COURT:  All right.  Granted.

2                MR. KLEIN:  Thank you, your Honor.

3                THE COURT:  Thank you.

4                All right.  Mr. Rehn, anything else today from your

5        team?

6                MR. REHN:  Nothing further.  Thank you, your Honor.

7                THE COURT:  All right.  I thank you all very much.

8                And I'll be watching my emails.

9                Take care, everyone.  Have good weekends, if you can.

10               We're adjourned.

11                               *    *    *

12

13

14

15

16

17

18

19

20

21

22

23

24

25