# Exhibit A

September 14, 2025

The Honorable Judge Denise L. Cote
Daniel Patrick Moynihan
United States Courthouse, Courtroom 18B
500 Pearl St.
New York, NY 10007-1312

Regarding: Keonne Rodriguez


Honorable Judge Cote,

My name is Keonne Rodriguez. I write with respect for the Court and for your responsibility in deciding my sentence. On November 6, 2025, I will appear before you for sentencing after pleading guilty to conspiracy to operate an unlicensed money transmitting business. Although I am grateful for the defense attorneys representing me, I asked for the opportunity to speak in my own voice. It is important to me that you know I am not only pleading guilty, but also accepting full responsibility for my actions and working toward reconciliation for the harm my conduct caused.

I understand that I face a maximum penalty of 60 months in prison, and I trust in your wisdom in determining an appropriate sentence. With hopes of assisting your deliberation, I offer this letter to explain who I am, how I went wrong, and the concrete steps I am taking to ensure I live within the law going forward.

Since the day of my arrest, I have been coming to terms with the crime I committed. The company I helped build, Samourai Wallet, operated without the licenses required by law. That failure is mine. I should have slowed down, asked harder questions, and verified our compliance with regulators before proceeding. I did not. However principled my beliefs about privacy and innovation may have felt at the time, I now understand that good intentions are not a defense. The law sets boundaries, and I crossed them.

I also know that a tool designed to protect privacy can be misused. While *Samourai* was non-custodial and open source, I recognize that some people may have used it to conceal criminal activity. I regret my role in creating an environment where that was possible. Looking back, I wish I had done more to build safeguards — such as screening for certain high-risk transactions or consulting experts in financial compliance — and sought broader advice before launching. I am sorry to the Court, to society, to my family, and to the people who believed in me.

This letter is part of my commitment to personal accountability. I understand that the Court must weigh the seriousness of my offense in imposing a sentence. At the same time, I hope you will also consider the totality of my life and intentions. I am a devoted husband and son, an entrepreneur who worked hard, but who made a grave error in judgment. I am determined to correct that error. I know punishment is part of

justice, but I also believe that accountability includes accepting responsibility, learning from mistakes, repairing harm where possible, and rebuilding trust through lawful work and strict compliance.

Since the morning of April 24, 2024, when federal agents searched my home, I have reflected on every decision that brought me here. I have complied with every condition of release, respected the process, and used the constraints of home confinement and curfew to examine my choices. That time has convinced me that my professional life must be rebuilt on strict compliance, transparency, and service. Those were my obligations before, and they will guide me in the future.

In the pages that follow, I will share my background, the choices that led to this offense, the lessons I have learned since my arrest, and my plan to contribute lawfully after sentencing. I will present facts, acknowledge harm, and outline how I will prevent anything like this from happening again. Whatever sentence the Court imposes, I will accept it and comply fully. My hope is that, when you weigh everything, you will see genuine remorse and a sincere commitment to using my skills in ways that honor the law and contribute positively to society.

**Acceptance of Responsibility**

When I chose to plead guilty, it was because I knew it was the right thing to do. I did not want to waste the Court's time or resources by contesting something that I have come to understand clearly: I was operating in violation of the law. That realization did not come lightly. It came after months of reviewing my actions, examining the facts, and listening carefully to counsel who helped me understand the seriousness of the charges.

At the time the offense occurred, I believed I was working within legal boundaries. We had legal counsel who told us our operations were compliant. I relied heavily on that advice, but I now see that my reliance was misplaced because I did not go far enough. It was my responsibility—not my attorneys'—to question more deeply, to seek additional opinions, and to verify our compliance with every applicable requirement. I failed to do that.

This failure didn't step from a desire to facilitate criminal activity, but it was a failure of complacency, overconfidence in my understanding of a complex and evolving legal landscape, and a tendency to focus more on building the technology than on ensuring it was surrounded by the necessary legal guardrails. I thought I was doing the right thing, but I see now that I should have approached our operations with far greater caution and humility.

I also recognize that this was not a matter of simply "checking a box" or filing the right paperwork. Compliance is a culture, a constant process of evaluating risks, seeking advice, and adapting to legal requirements as they change. I should have been vigilant in fostering that culture from the beginning, and I was not. In retrospect, there were clear warning signs I could have acted on. For example:

- I could have paused our operations to reassess our licensing obligations.
- I could have reached out to regulators directly to clarify our responsibilities.
- I could have expanded the scope of our compliance team or hired outside experts with specific experience in money services regulations.

I did none of those things.

I want to be clear that I am not offering these examples to excuse myself or to shift responsibility. I share them because they represent the moments where I see, in hindsight, that I could have made different choices—choices that would have kept me within the law and avoided the harm my actions caused. I am in this predicament because I failed to recognize, respect, and act on the legal responsibilities that came with operating a business like ours. I accept that this failure caused real harm: it undermined trust in the financial system, it exposed my users and partners to risk, and it betrayed the faith of those who believed I would always operate with integrity.

Acknowledging this is difficult, but it is necessary. I know that acceptance of responsibility is more than just words on a page—it is a commitment to changing my approach, my priorities, and my decision-making going forward. My plea was the first step in that process. This letter, and my willingness to be transparent about my mistakes, is another. I will continue taking steps to ensure that I never again find myself in violation of the law.

With hopes of helping you know more about who I am, I'll offer more about my personal background, and how I got into this space.

**Personal Background**

I was born on August 4, 1988, in Miami, Florida. My parents, Jose and Tanya, divorced shortly after I was born. Despite the separation, both made a deliberate effort to remain active in my life. I grew up moving between their homes in the same general area of Miami Beach, experiencing two different households but a shared sense of love and care from each parent.

My father was born in Havana, Cuba, in 1956. His early life was marked by political upheaval. After the Cuban Revolution, his family left the island for Puerto Rico. My grandfather had owned a beverage factory in Havana, but the family lost everything when they left. They started over with very little. My father spent part of his adolescence in Puerto Rico and part in Miami, until his mother sent him to a military school in Tennessee to address behavioral issues. Returning to Miami, he worked a variety of jobs — as a plumber's assistant, as a beach attendant, and eventually as a lifeguard for the City of Miami Beach. Over three decades, he worked his way up to retire as a lieutenant. He never finished high school, but he taught me the value of steady work, responsibility, and showing up for the people who depend on you — lessons that still shape how I approach challenges.

My mother was born in London, England. She completed secondary school but did not attend college. In the mid-1980s, she moved to Miami to help my grandmother establish a halfway house for people with mental health challenges. My grandmother had been a social worker and administrator for a nonprofit in England, and the organization asked her to start a similar program in Miami Beach, and later in the Florida Keys. She did so despite pushback from local officials, even fighting city commissioners for the right to open the home. She eventually ran it successfully before transferring it to the county. My mother worked alongside her in those early years, later taking various jobs — in laundromats, preschools, and small businesses — to support herself and me after her divorce. We didn't have much money, but I never

doubted that I was loved or that my mother was doing everything she could to provide for me. Her example taught me perseverance and the importance of helping others, even when resources are scarce.

Growing up in Miami Beach, I was surrounded by diversity — people from all over the world, speaking many languages, and working in tourism, hospitality, and small businesses. I was curious and creative, though I was not a particularly engaged student. Sports didn't capture my interest, but I swam and surfed with my father. On the other hand, once I learned about computers, I became fascinated with technology.

In 1999, when I was about 10 or 11, my father bought a computer from a coworker. That single purchase changed the course of my life. I started with video games, but I quickly became fascinated by the software itself — learning to install programs, experiment with features, and figure out how things worked. I spent countless hours on early internet chat rooms, where I met people who became my first mentors. I had not been very social in school, and I didn't make friends easily. In the computer chat rooms, however, I found people who shared my interests in self-directed learning.

One friend I made in a chat room was Gil, who lived in Hawaii. He taught me how to learn computer languages, such as HTML and CSS, and insisted I code by hand rather than rely on drag-and-drop programs like Dreamweaver. Another friend, Ray, lived in Puerto Rico. He taught me graphic design. These interactions opened my world and made me realize that I could learn directly from people anywhere. In fact, writing this personal story takes me back to those days; self-directed learning has been one of the few ways I have been able to feel productive since my arrest.

By the time I turned 13, I had gained the confidence to build websites. The first opportunity came from the youth group at my church. I grew up attending non-denominational Christian churches with my father, who played bass in the church band. These communities gave me my first opportunities to use my skills in service of others.

Completing that project gave me proof of my abilities, and I began responding to ads on Craigslist from small business owners and entrepreneurs who needed websites. I built a portfolio, met with clients, and delivered projects for $500 to $1,000 apiece. By eighth grade, I had earned several thousand dollars. I reinvested much of that money into better equipment and even paid for a second internet line at home to avoid interruptions from dial-up.

In ninth grade, I landed my biggest project yet: a $5,000 contract to build and manage a website for the Miami Beach chapter of the United States Lifesaving Association. Completing that project gave me a real sense of confidence — proof that I could compete in the professional world even as a teenager. But school was becoming more of a hurdle than a help. I was skipping classes frequently, and administrators told me I couldn't advance to 11th grade because of absences. They also wanted me to take an introductory computer class, which felt like a waste of time given my skills. By then, my mother had returned to England for health reasons, and I was living full-time with my father.

My father knew about my nonprofit work, but he didn't know that the school was asking me to participate in computer classes for people who didn't know how to turn on a computer. I explained to him how the school was wasting my time, and I asked for his permission to quit school so that I could begin building a

career. My dad supported my dream, and he made a deal with me: I could leave school if I earned my GED. I did so in May 2005, at age 16.

After doing a few projects and earning some money, I moved to England. I had been visiting since childhood, and I thought it would be good to try college again and to be closer to my mother's side of the family. In England, college begins at 16. I attended for about a year, but I quickly learned that I could gain more experience and earn more income by working. I took freelance web design jobs and eventually joined an advertising company that published a magazine and directory for the superyacht industry in the Mediterranean. I built their web directory and earned the equivalent of $30,000 a year — enough to cover all my expenses and also support a girlfriend who had joined me in England but could not work because of immigration restrictions.

In 2007, I returned to the United States, moving into a house my father owned in Vero Beach, Florida. Within weeks, SpectorSoft, a software company, hired me as a senior web designer. When they asked how much I wanted to earn, I suggested $40,000. Based on the skills they saw in my portfolio, the founders offered a salary of $50,000 per year, which later grew to $60,000 with bonuses. While working at SpectorSoft, I learned about software development, business operations, and how to attract and retain customers. I also began learning about investing from a colleague who taught me about retirement planning.

I seemed to be moving in the right direction until 2010, when tragedy struck. My uncle Sean, a former music executive and my only maternal relative in the U.S., died by suicide. I took three weeks off to handle his affairs in Los Angeles, but when I returned, SpectorSoft let me go. That loss, combined with sudden unemployment, sent me into a depression. I started drinking heavily and abusing drugs. I briefly worked for a company in Miami that I later discovered was involved in questionable practices. I left, but I felt adrift. I used marijuana heavily and lost my sense of direction.

In 2011, a friend in Chicago offered me a job at Network Ninja. I moved, worked to get sober, and rebuilt my career. I earned $90,000 a year, worked with major clients, and designed case management software for Legal Services NYC — a project that helped preserve their business relationship with our company. While in Chicago, I met my wife, Lauren. We moved in together, and I supported us on my income while she transitioned out of working in a bar.

In 2013, I discovered Bitcoin. I was fascinated by its potential to decentralize finance and give people more control over their assets. That same year, Lauren and I moved to England, and I attended a Bitcoin conference in London. There, I met several influential leaders of the Bitcoin community, and I began seeking opportunities to earn a living in the Bitcoin industry. I took a job working at [Blockchain.com](Blockchain.com), where I met my co-founder, Bill.

**Explanation of the Offense**

While working at Blockchain.com, my co-founder, Bill, and I began developing an idea that would eventually become Samourai Wallet. It started as a hobby — a side project we pursued outside of our regular jobs. We saw what we believed was a gap in the Bitcoin ecosystem: although transactions on the

Case 1:24-cr-00082-DLC     Document 154-1     Filed 10/24/25     Page 7 of 10

6

blockchain are transparent, there was no simple, user-friendly way for everyday people to protect their financial privacy. Our goal was to create a wallet that gave users the same kind of privacy that cash transactions traditionally provide in the world of physical currency.

But we were software developers, not business leaders or compliance executives. Our expertise was in building technology, not in navigating the regulatory frameworks that govern financial services. From the outset, we designed Samourai to be non-custodial — meaning that the users, and only the users, controlled their funds. We never had access to their money. The software itself was free to download, our code was open source, and anyone could review it. To support the business, we offered optional paid features:

- Ricochet — which added extra "hops" to a transaction in order to break the link between the sender and receiver in the blockchain record.

- Whirlpool — a form of "coin join" that combines transactions from multiple users, making it significantly more difficult to trace the origin and destination of funds.

From a technical standpoint, I believed these features were innovative, legitimate solutions to the growing problem of surveillance in digital transactions. From a philosophical standpoint, I believed that privacy in financial matters was not only desirable but a basic right. I saw it as an extension of values I had grown up with — protecting one's personal information and being able to transact without undue intrusion.

But I also understood, even then, that tools designed to protect privacy can be used for unlawful purposes. I relied heavily on our legal team's assurances that we were compliant with the law as we operated. At the time, I believed those assurances were sufficient. I see now that they were not. I should have taken more personal responsibility to understand the licensing requirements in the United States, to evaluate whether our services met the definitions of a money services business, and to implement policies and controls that could detect and deter illicit use. In hindsight, I could have paused our operations to seek a direct advisory opinion from regulators before launching certain features. I did not take that step, and failing to do so was a serious mistake.

Operating such a service in the U.S. without the proper licenses violated laws that I did not understand — or perhaps did not want to understand. Regardless of my intent or beliefs about the legitimacy of privacy tools, the reality is that we were offering services that, under U.S. law, required licensure and compliance programs we did not have. That was my responsibility, and I failed to meet it. I also failed to consider that our refusal or inability to collect certain user data, while attractive to those who valued privacy, also made it impossible for us to screen out users engaged in illegal activities.

The consequences of those failures came abruptly on April 24, 2024. In the early hours before dawn, FBI agents arrived at my home. My wife and I were handcuffed while our dog barked and panicked. Agents searched every room. They seized our servers, our domain, and other business property. Within hours, the operation I had worked on for years was shut down. The business I had poured my energy into was gone, and in its place was the sudden and devastating realization that I was now facing serious criminal charges.

That morning marked the permanent end of Samourai Wallet. Over the next several months, in the solitude of home confinement, I reflected deeply on what I should have done differently. I replayed decisions I had made and conversations I had ignored. I realized that I had allowed my passion for building technology to outweigh my obligation to ensure it was built and run within the full bounds of the law. I thought about how my failure to act more carefully had put my family through the trauma of that morning, had destroyed the livelihood we depended on, and had undermined the trust of the very community I believed I was serving.

**Lessons Learned**

This experience has taught me, in the most difficult way possible, that good intentions do not shield a person from legal consequences. The law defines the boundaries within which all of us must operate, and it was my duty to understand and respect those boundaries. I have learned that passion for an idea or a technology cannot replace the obligation to comply with the rules that govern it.

I now understand that when you build a tool with the potential to be used for both legitimate and illegitimate purposes, you have a responsibility to think beyond the best-case scenario. You must anticipate how it might be misused, implement safeguards to reduce that risk, and be willing to slow down or change course when compliance questions arise. I failed to do that. My focus was on solving the technical challenge and defending the principle of privacy. In doing so, I neglected the equally important duty to ensure the product operated fully within the law.

This process has also taught me humility. I have had to face my wife, my family, and my friends, knowing that my actions put me here. They have seen me at my lowest, and I have had to accept their disappointment alongside their support. It is humbling to realize that the trust others place in you can be lost far more quickly than it is earned.

I have also learned that values such as privacy and personal freedom, which I still believe in, must always be balanced with accountability and compliance. Those principles are not mutually exclusive — in fact, they depend on each other. A product or service that claims to protect individual rights but ignores legal obligations ultimately undermines the very freedoms it seeks to defend.

Most importantly, I have realized that I cannot assume my values alone will protect me from the consequences of failing to follow the law. Integrity is not just about what you believe — it is about the choices you make when those beliefs intersect with your legal and ethical responsibilities. In the future, I will approach any project or business decision with a commitment to compliance first, ensuring that my work aligns with both my personal principles and the laws that govern them.

**Rehabilitation and Positive Actions**

Since my arrest, I have made it a priority to use my time productively and in ways that reflect the lessons I have learned. One of the most meaningful opportunities has been working with a law firm that specializes in tracing and recovering stolen cryptocurrency for victims of scams. This work is, in many ways, the opposite of what the government accused me of enabling. By applying my blockchain expertise

to identify stolen assets and assist in their recovery, I have been able to use my skills for a constructive, restorative purpose. It has been gratifying to know that I could help victims reclaim funds they thought were lost forever. Each case has reminded me that technology can be a powerful force for good when it is paired with accountability and ethical use.

I have also devoted significant time to self-education. I have read extensively in subjects that will guide my life moving forward — law, economics, ethics, and personal development. Books and articles on compliance and regulatory frameworks have given me a clearer understanding of the requirements I once overlooked. Works on economics and finance have helped me see the broader impact of unregulated activity on markets and public trust. Personal development materials have encouraged me to examine my own decision-making processes and to adopt habits that will support integrity and careful judgment.

This process has helped me focus. I have kept detailed notes on what I have learned and thought critically about how I will apply this knowledge in the future. I have recalibrated my priorities and deepened my understanding of the system I am about to enter as a person convicted of a felony offense. I have reflected on the difference between building something simply because it can be built, and building something because it is both legal and beneficial to others.

During my time in home confinement, I have also made it a priority to fulfill all bail conditions without incident. I have respected every restriction placed upon me, reported as required, and remained in full compliance with the Court's orders. While physically confined, I have focused on supporting my wife, who has carried much of the emotional and practical burden of this situation. Our relationship has been tested, but I have committed to being present, communicative, and dependable, even under difficult circumstances.

Finally, I have begun preparing a detailed plan for living a lawful and constructive life after my release. Although I do not yet know what sentence this Honorable Court will impose, I want my future work to contribute positively to others, to reflect the lessons I have learned, and to demonstrate that I am worthy of the trust I hope to rebuild. My interest in this planning began when I studied the Bureau of Prisons website, which in turn led me to begin volunteering with a nonprofit organization whose mission is to help people in custody prepare for successful reentry into society.

**Future Plans**

When I am released, I intend to live modestly and work only in fully compliant businesses. My first priority will be to ensure that every professional step I take is aligned with both the letter and spirit of the law. I plan to continue applying my blockchain analytics skills to help prevent fraud, assist in asset recovery, and protect users from exploitation. In doing so, I can turn the expertise that once contributed to my offense into a tool for safeguarding others.

I also hope to mentor young technologists, emphasizing the importance of integrating legal compliance into innovation from the very beginning. I want to help them avoid the mistakes I made by showing that success in technology is measured not only by what you can build, but by building it in a way that is ethical, transparent, and lawful.

In addition, I am committed to fulfilling any restitution the Court orders, understanding that repayment is part of taking responsibility for my actions. I will also seek to give back to my community through volunteer work and mentorship programs, using my experience to help others navigate challenges and make positive choices. My goal is to rebuild my life on a foundation of lawful conduct, service to others, and public contribution, so that over time I can earn back the trust I have lost.

**Closing Appeal**

Your Honor, I am deeply sorry for my actions. I regret the harm I caused to the integrity of the financial system, the disruption I brought to my community, and the pain I have caused my loved ones. This case has been the most humbling experience of my life, and it has forced me to confront not only the decisions that led me here but also the values I must live by moving forward.

I accept whatever sentence you impose, trusting that you will weigh my remorse, my efforts toward rehabilitation, and my concrete plans for the future. My commitment is to ensure that when I leave this process, I will be a better man — one who lives by the law, honors his obligations, and contributes positively to those around him.

Thank you for considering my words, and for allowing me the opportunity to present my story and my intentions directly to the Court.

Respectfully,
Keonne Rodriguez